**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

$186,416.00 IN U.S. CURRENCY,
            *Defendant.*

─────────────────────────

UNITED MEDICAL CAREGIVERS
CLINIC, INC.,
            *Claimant-Appellant.*

No. 07-56549

D.C. No.
CV-05-06703-SVW-
SH

ORDER
AMENDING
OPINION AND
DENYING
REHEARING AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
March 12, 2009—Orange, California

Filed October 20, 2009
Amended January 7, 2010

Before: Michael Daly Hawkins, Marsha S. Berzon, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton

**COUNSEL**

Paul L. Gabbert, Santa Monica, California, for the claimant-appellant.

Thomas P. O'Brien, United States Attorney; Christine C. Ewell, Assistant United States Attorney, Chief, Criminal Division; Steven R. Welk, Assistant United States Attorney, Chief, Asset Forfeiture Section; P. Greg Parham (argued), Special Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

**ORDER**

This court's opinion, filed October 20, 2009, is amended as follows:

1.  At page 14636 of the slip opinion (583 F.3d 1220, 1230-31), replace the text:

    Under federal forfeiture statutes, the Secretary of the Treasury is permitted to transfer forfeited property to "any State or local law enforcement agency that participated directly or indirectly in the seizure or forfeiture of the property." 19 U.S.C. § 1616a(c)(1)(B)(ii).

    with the following sentence:

    Under federal forfeiture statutes, the Attorney General is permitted to transfer forfeited property to "any State or local law enforcement agency which partici-

pated directly in the seizure or forfeiture of the property." 21 U.S.C. § 881(e)(1)(A).

With the opinion as amended, the petition for rehearing is denied. If the parties wish to file a new petition for rehearing and/or petition for rehearing *en banc*, they may do so within 14 days from the date of this order.

The petition for rehearing, filed December 3, 2009, is DENIED.

---

**OPINION**

CLIFTON, Circuit Judge:

California state law differs from federal law in its treatment of the distribution and possession of marijuana for purportedly medical purposes. California has concluded that marijuana may have medicinal value, and under California law the distribution and possession of "medical marijuana" is not illegal. *See* Cal. Health & Safety Code § 11362.5(b)(1)(A) (declaring that one purpose of a 1996 voter-approved medical marijuana initiative is "[t]o ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes"); *id.* § 11362.765 (exempting from criminal liability individuals who perform certain actions involving medical marijuana). The federal government has not recognized a legitimate medical use for marijuana, however, and there is no exception for medical marijuana distribution or possession under the federal Controlled Substances Act, 21 U.S.C. §§ 801-971. *See Gonzales v. Raich*, 545 U.S. 1, 14-15 (2005) (explaining that the distribution or possession of marijuana is a criminal offense under the Controlled Substances Act); *Raich v. Gonzales*, 500 F.3d 850, 854-55 (9th Cir. 2007) (discussing marijuana's status as a "Schedule I" controlled substance, a designation available only to certain substances

found to have "no currently accepted medical use in treatment in the United States" (quoting 21 U.S.C. § 812(b)(1))).

This difference lies behind the civil forfeiture case before us. The case concerns $186,416.00 in U.S. currency seized by officers of the Los Angeles Police Department ("LAPD") during a search of the United Medical Caregivers Clinic ("UMCC" or "Clinic"), a non-profit medical marijuana dispensary owned by United Medical Caregivers Clinic, Inc. Although the LAPD secured a state court warrant for the search, the Department failed to inform the issuing court of extensive evidence that UMCC may have been operating in accordance with California's medical marijuana laws. The state court subsequently approved the release of the seized currency to the United States, which then initiated a federal civil forfeiture action against it. UMCC presented its own claim to the currency. On UMCC's motion the District Court suppressed the currency as evidence, holding the search to have been illegal. The District Court held, however, that the government had sufficient evidence, independent of the currency itself and of any other evidence tainted by the illegal search, to initiate the forfeiture action against the currency. We conclude that the evidence relied upon by the District Court was itself tainted by the illegal search and should be suppressed, and that without the suppressed evidence the government lacked probable cause to connect the defendant currency to a violation of federal law. We thus reverse the judgment of the District Court and remand for further proceedings.

## I.   Background

In early 2005 LAPD Sergeant Miguel Lopez began receiving complaints of marijuana smoking near the UMCC offices on Wilshire Boulevard. Many of the complainants observed that the individuals smoking marijuana carried the drug in small brown paper bags.

On March 15, 2005, Lopez investigated and found a flyer referring to "UMCC" and advising Clinic patrons to leave the premises after purchasing marijuana. Lopez located the UMCC facility and entered the building's lobby. Once inside he "immediately smelled the strong odor of marijuana" and observed a number of people leaving the Clinic's offices with small brown paper bags.

UMCC staff admitted Lopez into its offices. While he was there, at least three individuals appear to have told Lopez that UMCC was a medical marijuana provider: Scott Feil, UMCC's chief executive officer; Gabriella Jaramillo, a manager; and Michael Bryan, a security guard. Additionally, Jaramillo provided Lopez with copies of UMCC's corporate papers and its City of Los Angeles Tax Registration Certificate, as well as with written information about California's medical marijuana laws. In a declaration filed later, Jaramillo agreed with Lopez's estimate that he viewed approximately 50 individuals purchasing marijuana from UMCC within a 45-minute period. She added that "[e]ach of these patients was purchasing medical marijuana pursuant to a doctor's written recommendation" and that Lopez did not object to any of the transactions.

Lopez called his watch commander to report the situation. The LAPD applied for a search warrant to search the UMCC facility. A Los Angeles Superior Court judge issued the warrant, and it was executed the same evening. During the search LAPD officers seized $186,416.00 in U.S. currency from the Clinic's safe and from a cash register , along with about 209 pounds of marijuana, 21 pounds of hashish, and 12 pounds of marijuana oil.

No criminal charges were filed against UMCC or any of its employees, but the LAPD continued to hold the currency. About two months later UMCC filed a motion in Los Angeles Superior Court for return of the currency and other items seized by the LAPD on March 15. Attached to this motion

was a declaration by Feil, the chief executive officer of UMCC, executed on May 12, 2005 ("Feil declaration").[1]

In his declaration Feil acknowledged the connection between the currency and UMCC's activities but insisted that UMCC was, under California state law, a lawful medical marijuana provider. The declaration stated, among other things, that "[a]ll cannabis products obtained or produced by UMCC are only distributed to patient members of UMCC. . . . UMCC does not allow the distribution of cannabis products to non-patients or non-members[.]" Feil continued: "On March 15, 2005, the Los Angeles Police Department seized numerous cannabis products, approximately $200,000 in currency, and other items including security equipment. The materials seized were all, to the best of my knowledge and belief, legitimately used in the course of UMCC's activities as described above."

In late August 2005, the state court ordered the release of the seized currency from state court jurisdiction to allow the initiation of federal forfeiture proceedings. An LAPD detective had presented this order for the state court's approval.

On September 12, 2005, the federal government filed in District Court a complaint for forfeiture pursuant to 21 U.S.C. § 881(a)(6), alleging that the defendant currency was seized from UMCC and was traceable to narcotics violations under 21 U.S.C. §§ 841, 846. UMCC claimed ownership of the currency and filed a motion to suppress all evidence seized pursuant to the state search warrant issued on March 15, 2005. The District Court granted the motion to suppress, holding that there had not been probable cause to issue the warrant for

---

[1]UMCC filed a second copy of this motion and the Feil declaration in early August 2005, again in Los Angeles Superior Court, as attachments to a motion entitled "Motion for Order To Show Cause Why the Court's 'Order for Release of Property Pursuant to Search Warrant for Federal Forfeiture Proceedings' Should Not Be Set Aside."

a violation of state law. In considering probable cause under state law, the District Court found that the warrant affidavit submitted by the LAPD had been "misleading" and contained "reckless" omissions of numerous relevant facts pertaining to UMCC's status as a medical marijuana dispensary.

UMCC subsequently brought a motion for summary judgment in the federal civil forfeiture action, arguing that the government lacked sufficient evidence to initiate the action against the defendant currency. The District Court denied that motion, holding in a reported decision that the government had sufficient evidence to initiate its action, even in the absence of all evidence excluded under the court's prior suppression ruling and the fruits of the suppressed evidence. *United States v. $186,416.00 in U.S. Currency*, 527 F. Supp. 2d 1103, 1107 (C.D. Cal. 2007). Specifically, the District Court held that the Feil declaration "provided the Government with sufficient untainted probable cause" to proceed, as the declaration was not subject to suppression under any of a variety of theories. *Id.* at 1141-42. UMCC then consented to a judgment forfeiting the currency to the government and filed a timely appeal.

## II.   Discussion

UMCC argues on appeal that the District Court erred in concluding that the government had probable cause to initiate the forfeiture proceeding. The Clinic contends that the Feil declaration was "the only possible basis for the Government to establish probable cause" and that the court should not have considered the declaration because it was tainted by the unlawful search of UMCC's offices. The government, in turn, defends the District Court's ruling that the government properly could rely on the Feil declaration to establish the defendant currency's alleged connection to marijuana activities unlawful under federal law. In addition, the government offers further evidence that it contends could support a determina-

tion of probable cause, even if it were unable to rely on the Feil declaration.

## A.   Illegality of the Search

We begin by noting that the government does not contest the District Court's finding that the search by the LAPD was unlawful despite the state court warrant, nor does it contest the resulting suppression of the currency and other evidence seized during that search. Accordingly, the District Court's August 2006 order quashing the search warrant and suppressing the defendant currency is not before us. *See, e.g.*, *Spurlock v. FBI*, 69 F.3d 1010, 1018 (9th Cir. 1995).

There is a disagreement as to the nature of the search's illegality, however. When the District Court granted UMCC's suppression motion in August 2006, it did so on Fourth Amendment grounds, citing *United States v. Stanert*, 762 F.2d 775, 780-81 (9th Cir. 1985), in which we held that "the Fourth Amendment mandates that a defendant be permitted to challenge a warrant affidavit valid on its face when it contains deliberate or reckless omissions of facts that tend to mislead."

In its summary judgment order of August 2007, the District Court reconsidered and instead described the warrant as invalid not for a constitutional infirmity but for its failure to meet the procedural requirements provided in Rule 41 for obtaining a federal search warrant. *$186,416.00 in U.S. Currency*, 527 F. Supp. 2d at 1138. The court reasoned that the LAPD had probable cause to believe that UMCC was operating in violation of *federal* narcotics law, even though it lacked probable cause with regards to state law. *Id.* As such, the LAPD's only error, according to the District Court, was in failing to comply with the procedural requirements of Rule 41, such as having a federal law enforcement officer request the warrant and obtaining approval from a magistrate judge unless none was reasonably available. *Id.*; *see also* Fed. R. Crim. P. 41(b).

**[1]** We cannot approve this analysis. Rule 41 is inapplicable to "searches conducted by state officers with state warrants issued by state judges, with minimal or no federal involvement," even if federal prosecution results. *United States v. Piver*, 899 F.2d 881, 882 (9th Cir. 1990). The present case fits this description. Only a "federal law enforcement officer or an attorney for the government" can request a search warrant under Rule 41, and no such individual was involved in requesting the warrant at issue here. Fed. R. Crim. P. 41(b).

**[2]** While there may have been probable cause to search UMCC for a violation of federal law, that was not what the LAPD was doing. Nothing in the documents prepared at the time the warrant was obtained from the state court or in the procedure followed to obtain that warrant supports the proposition that the LAPD thought it was pursuing a violation of federal law. Instead, it sought a warrant from a state court judge, though, as the District Court found, it lacked probable cause for a state law violation and failed to inform the state court judge of relevant facts that supported the conclusion that UMCC was not in violation of state law. The LAPD, a city agency, never initiated the process of seeking a federal search warrant from a federal magistrate or indicated that it was pursuing a violation of federal law.

**[3]** Accordingly, the search was not illegal simply because it failed to comply with Rule 41 but because it violated UMCC's Fourth Amendment right against unreasonable searches and seizures, in light of the absence of probable cause under state law. *See Piver*, 899 F.2d at 882 (holding that state warrants must adhere to federal constitutional standards).

*B.   Probable Cause To Institute the Forfeiture Action*

The fact that the currency was seized by the LAPD unlawfully does not necessarily mean that it cannot be subject to forfeiture. *See United States v. One (1) 1971 Harley-Davidson*

*Motorcycle Serial # 4A25791H1*, 508 F.2d 351, 351 (9th Cir. 1974) (per curiam) ("The mere fact of the illegal seizure, standing alone, does not immunize the goods from forfeiture." (internal quotation marks omitted)). The government may still institute a forfeiture action if it can demonstrate probable cause for doing so, based upon untainted evidence. *See United States v. $493,850.00 in U.S. Currency*, 518 F.3d 1159, 1169 (9th Cir. 2008). The probable cause requirement is statutory. Pursuant to 19 U.S.C. § 1615, which also assigns the burden of proof in forfeiture proceedings, the government must show that probable cause exists to institute its action. We recently held that this requirement survived the enactment of the Civil Asset Forfeiture Reform Act of 2000. *$493,850.00 in U.S. Currency*, 518 F.3d at 1169.

**[4]** "The government has probable cause to institute a forfeiture action when it has reasonable grounds to believe that the property was related to an illegal drug transaction, supported by less than prima facie proof but more than mere suspicion." *Id.* (internal quotation marks omitted). Probable cause may be supported only by facts "untainted" by any prior illegality. *See United States v. Driver*, 776 F.2d 807, 812 (9th Cir. 1985). It may be based only upon information gathered before the forfeiture action was instituted. *$493,850.00 in U.S. Currency*, 518 F.3d at 1169.

We therefore must determine whether the government had probable cause to file its complaint on September 12, 2005. The government argues that probable cause was supported by the Feil declaration and, alternatively, by its knowledge of UMCC's marijuana sales at the time the forfeiture action was instituted, independent of any evidence tainted by the unlawful search. The District Court held that the Feil declaration was admissible and by itself gave the government sufficient probable cause for bringing this action. *$186,416.00 in U.S. Currency*, 527 F. Supp. 2d at 1142. We review the District Court's determination of probable cause de novo. *$493,850.00 in U.S. Currency*, 518 F.3d at 1164.

### 1.  The Feil Declaration

In his declaration, Feil, UMCC's CEO, admitted that UMCC "distributed" marijuana. The declaration stated: "All cannabis products obtained or produced by UMCC are only distributed to patient members of UMCC." Feil then linked the defendant currency to the distribution of marijuana by declaring that seized items were "used in the course of UMCC's activities as described above." Because there is no exception for medical marijuana distribution under the federal Controlled Substances Act, 21 U.S.C. §§ 801-971, *see Raich*, 545 U.S. at 14-15, the Feil declaration would suffice to establish probable cause to believe that the money in question was linked to sales of marijuana, if we conclude that the government was permitted to rely on it.

UMCC argues that the government is barred from relying on the Feil declaration because it is tainted by the unlawful search conducted by the LAPD. We consider, then, whether the Feil declaration must be excluded as the "fruit" of the LAPD's unconstitutional actions. *See United States v. Crews*, 445 U.S. 463, 470 (1980) ("[T]he exclusionary sanction applies to any 'fruits' of a constitutional violation . . . ."). The Fourth Amendment exclusionary rule applies to civil forfeiture proceedings. *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696 (1965); *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1063 (9th Cir. 1994), *superseded by statute on other grounds as stated in United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002). We review de novo the District Court's refusal to set aside the Feil declaration on these grounds. *See United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc).

**[5]** We recognize, as have other courts, that the fact-intensive nature of Fourth Amendment cases demands that each be evaluated on its own facts. *United States v. Fifty-Three Thousand Eighty-Two Dollars in U.S. Currency, $53,082.00*, 985 F.2d 245, 248 (6th Cir. 1993); *see also*

*Brown v. Illinois*, 422 U.S. 590, 603 (1975) ("The question whether a [criminal defendant's] confession is the product of a free will . . . must be answered on the facts of each case."). To apply the exclusionary rule to the unique set of facts presented here, we must consider the rule's dual purposes: to deter similar police misconduct in the future and to preserve the integrity of the courts. *See Dunaway v. New York*, 442 U.S. 200, 217-18 (1979). We have observed that "[w]hether the twin aims of deterrence and judicial integrity warrant application of the exclusionary rule depends largely on the facts of each case." *Crawford*, 372 F.3d at 1054.

**[6]** Before beginning our analysis we note that the exclusionary rule is particularly well-suited to advance both of these goals in the context of civil forfeiture proceedings. Law enforcement agencies today depend, at least in part, on the proceeds of forfeiture actions to finance their activities. *See* Mark J. Crandley, *A Plymouth, A Parolee, and the Police: The Case for the Exclusionary Rule in Civil Forfeiture After* Pennsylvania Board of Probation *and* Parole v. Scott, 65 Alb. L. Rev. 147, 160 (2001). The Supreme Court has recognized that, as a consequence, the government has a substantial financial stake in drug forfeitures. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 56 n.2 (1993) (citing a 1990 memorandum by the Attorney General urging United States Attorneys "to increase the volume of forfeitures in order to meet the Department of Justice's annual budget target"). Given the government's strong financial incentive to prevail in civil forfeiture actions, the application of the exclusionary sanction in these cases is likely to prove especially effective in deterring law enforcement agents from engaging in illegal activity.[2] Applying the exclusionary rule in forfei-

---

[2]One observer contends that "[t]he deterrence to police misconduct created by the exclusionary rule in civil forfeiture is unique because forfeiture plays a large role in modern police work, officers have a financial stake in seized assets, and the proceedings themselves are quasi-criminal." Crandley, 65 Alb. L. Rev. at 178.

ture proceedings also protects judicial integrity by ensuring that the courts do not serve as a conduit through which the government fills its coffers at the expense of those whose constitutional rights its agents violated.

Moreover, the exclusion of evidence in forfeiture proceedings is without the major societal cost associated with exclusion in criminal cases: setting a criminal free. Justice Cardozo's famous critique of the exclusionary rule, that it allows "[t]he criminal . . . to go free because the constable has blundered," does not apply to forfeitures. *People v. Defore*, 150 N.E. 585, 587 (N.Y. 1926). The only tangible cost to society from excluding evidence in a case like ours is monetary, a far less compelling reason to restrict the rule's application than the risk of freeing a guilty party.

**[7]** To determine whether evidence, such as the Feil declaration, is subject to exclusion as the fruit of a constitutional violation, we must ask whether the evidence has been obtained "by exploitation of [the] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (internal quotation marks omitted). Challenged evidence is not considered the fruit of lawless police conduct when the connection between the illegality and the evidence becomes "so attenuated as to dissipate the taint." *Id.* at 491 (internal quotation marks omitted).

**[8]** As a preliminary step, it is plain that the Feil declaration was the product of the LAPD's illegal activity. *See New York v. Harris*, 495 U.S. 14, 19 (1990). "There is no question of 'attenuation' until the connection between the primary illegality and the evidence obtained is established." *Crawford*, 372 F.3d at 1058 (quotation marks omitted). As the Supreme Court has recognized, "most cases begin with the premise that the challenged evidence is in some sense the product of illegal governmental activity." *Crews*, 445 U.S. at 471. This case is no exception. The LAPD's illegal search revealed the defen-

dant currency and allowed for its seizure. Feil, in turn, submitted his declaration for the express purpose of securing the return of the illegally seized currency. This being so, there indisputably is a strong connection between the unlawful search and the Feil declaration.

The question then becomes whether the attenuated basis exception applies. We observe that UMCC does not dispute, nor would there be grounds for doing so, that Feil's declaration was "voluntary," in the sense pertinent to the Fifth Amendment. Nevertheless, whether a statement is voluntary is merely a "threshold requirement" for admissibility. *Brown*, 422 U.S. at 604. For the "causal chain" between the illegality and the subsequent statement to be broken, the statement also must be "sufficiently an act of free will to purge the primary taint." *Id.* at 602 (quoting *Wong Sun*, 371 U.S. at 486). To guide this inquiry, the *Brown* Court identified several factors relevant to whether a statement is sufficiently attenuated from the illegality as to be admissible: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603-04 (footnotes and internal citation omitted). The Court also emphasized that the Fourth Amendment cannot turn on any single "talismanic test," given the diverse "possibilities of misconduct" that exist. *Id.* at 603.

With this in mind, we now determine "[w]hether the twin aims of deterrence and judicial integrity warrant application of the exclusionary rule" under the unique facts of the present case. *Crawford*, 372 F.3d at 1054. Applying the factors put forth by the Supreme Court in *Brown*, we consider, first, that Feil executed his declaration on May 12, 2005, nearly two months after the illegal search of UMCC. While this is a relatively long time, "there is no 'bright-line' test for temporal proximity" in an attenuation analysis. *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003). Rather, we must consider whether intervening circumstances may have purged the Feil

declaration of taint from the illegal search. *Brown*, 422 U.S. at 603-04.

**[9]** Under this factor, we do not find any intervening circumstances that would allow us to say that Feil made "an unconstrained, independent decision that was completely unrelated to the initial unlawful violation." *United States v. Washington*, 387 F.3d 1060, 1074 (9th Cir. 2004) (internal quotation marks and brackets omitted). Far from making an "unconstrained, independent decision" to file his declaration, Feil had to offer a declaration of ownership on UMCC's behalf, or else UMCC would have lost all hope of rectifying the "initial unlawful violation" by the LAPD. *Id.* This is so because at the time UMCC filed its motion for return of the seized currency in state court, with the Feil declaration attached, such a filing appeared to be its only option for regaining the currency unlawfully seized by the LAPD. Feil's declaration, therefore, was not only closely tied to the LAPD's illegal activity but was virtually compelled by it.

**[10]** In addition, when discussing the first two attenuation factors, we have held that "[i]t is not enough for Fourth Amendment attenuation that [a] statement be uncoerced; the defendant's 'free will' must also be sufficient to render inapplicable the deterrence and judicial integrity purposes that justify excluding his statement." *United States v. Perez-Esparza*, 609 F.2d 1284, 1289 (9th Cir. 1979). Considering Feil in place of "the defendant" referenced in our precedent, we conclude that Feil's act was not one of free will that would overcome our substantial interests in deterring official illegality and upholding judicial integrity. As we have discussed, Feil could obtain return of UMCC's illegally seized money only by asserting UMCC's ownership interest in the currency, thereby leaving his decision well short of being a product of an "unconstrained" and "independent" free will. *Washington*, 387 F.3d at 1074. At the same time, substantial deterrence interests will be served by refusing to allow the government to rely on the Feil declaration, given law enforcement's strong

incentive to prevail in forfeiture actions. The integrity of this court also is served by our refusal to allow the government to profit from illegal activity by law enforcement when such activity produces incriminating evidence like the Feil declaration.

[11] The third attenuation factor is "the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 604. When applying for a warrant to search UMCC, the LAPD was aware of extensive evidence to suggest that the Clinic may have been operating in compliance with California law permitting medical marijuana sales. Nevertheless, in its warrant affidavit, the LAPD omitted any reference to this evidence when applying to a state magistrate for a search warrant under *state* law. The District Court properly found that the warrant affidavit omitted the following undisputed facts:

- that Lopez [the first officer to arrive at UMCC] and other officers at the clinic were repeatedly told that UMCC was a valid medical marijuana dispensary under California's medical marijuana laws, and were handed copies of the relevant statutes and associated literature;

- that patients who entered the clinic held letters from physicians recommending marijuana for their ailments;

- that while LAPD officers were on the scene, approximately fifty patients obtained marijuana with doctor's letters and without objection from the officers;

- that Lopez was voluntarily buzzed in by UMCC staff, who were polite and cooperative throughout the encounter;

- and that Lopez was shown UMCC's incorporation papers and a copy of its City of Los Angeles Tax Registration Certificate for a retail business.

By omitting these facts, the LAPD misled a state judge into perceiving UMCC's conduct as criminal when, in fact, it was probably legal under California law. This is no trivial distinction under California narcotics law. While designated owners, operators, or employees of medical marijuana clinics are not subject to state criminal liability for certain marijuana-related offenses, *see* Cal. Health & Safety Code §§ 11362.7, 11362.765, individuals not covered by California's medical marijuana laws still face prison time if convicted of, among other offenses, selling marijuana or possessing it for sale, *id.* §§ 11359, 11360. Under California law these two situations differ dramatically, and the difference hinges entirely on information the LAPD failed to provide the state magistrate. In short, the LAPD simply ignored copious evidence of UMCC's compliance with state law and failed to inform the state court judge of it.

**[12]** This police misconduct is both highly objectionable and closely connected to the Feil declaration. The LAPD's omission of crucial information from the warrant affidavit enabled its illegal search of UMCC's offices and its seizure of the defendant currency. This, in turn, led directly to Feil's declaration as, without a statement of ownership, UMCC would have been left without legal recourse to regain the currency that was illegally taken from its possession. Because this unbroken "causal chain" links the initial illegality and Feil's subsequent statement, the Feil declaration is not "sufficiently an act of free will to purge the primary taint" from the LAPD's unlawful actions. *Brown*, 422 U.S. at 602 (quoting *Wong Sun*, 371 U.S. at 486).[3]

---

[3]The government cites *United States v. Raposa*, 84 F.3d 502 (1st Cir. 1996), as an example of a court holding that a voluntary statement was "sufficiently an act of free will to purge the primary taint" of a prior illegal

**[13]** We are particularly concerned by the possibility that the LAPD might stand to profit from unlawful activity. It would be objectionable that any unit of government might profit from the LAPD's actions, but even greater concern arises here from the suggestion in UMCC's opening brief, not denied by the government, that the LAPD "stands to receive up to 80% of any forfeiture obtained by the federal government in this case." Although the record on appeal contains no indication of how any forfeiture proceeds might be divided between the federal government and the LAPD, we recognize the distinct and disturbing possibility that the LAPD could profit from its own illegal activity, were the government to prevail. Under federal forfeiture statutes, the Attorney General is permitted to transfer forfeited property to "any State or local law enforcement agency which participated directly in the seizure or forfeiture of the property." 21 U.S.C. § 881(e)(1)(A). The LAPD would qualify to receive forfeited

---

search. *Id.* at 505 n.7 (quoting *Wong Sun*, 371 U.S. at 486). In *Raposa*, a criminal defendant succeeded on a motion to suppress cocaine found in his apartment as the fruit of an illegal search, but subsequently agreed to plead guilty to a separate charge of heroin possession. Through his attorney, the defendant submitted to the federal probation officer for inclusion in his pre-sentence report ("PSR") a signed statement in which he voluntarily admitted ownership of the cocaine that had been suppressed. *Id.* at 503-05. The First Circuit held that the exclusionary rule "clearly could not have barred the district court from considering the defendant's voluntary statements as set forth in the PSR." *Id.* at 505. Indeed, the "[d]efendant [did] not and could not credibly argue that the statements recounted in the PSR constituted a fruit of the illegal search conducted on the day of his arrest," for the statements were voluntarily submitted and were provided after the ruling on the suppression motion. *Id.* at 505 n.7.

Feil likewise made a voluntary statement regarding ownership, but Feil's statement was made before the decision on the suppression motion, was directly aimed at remedying the illegal seizure of the currency, and so was tightly linked to the illegal seizure, as we have discussed. In *Raposa*, in contrast, the defendant's statements in the PSR were not so motivated. Accordingly, we do not consider the reasoning in *Raposa* to be relevant to the present case.

funds under this provision, should the federal government elect to make such a transfer.

**[14]** Accordingly, we exclude the Feil declaration as tainted by the unlawful search and hold that the government may not rely on it to establish probable cause for instituting its forfeiture action.[4]

### 2.  Other Government Evidence

**[15]** The burden thus falls on the government to show that it had probable cause to institute a forfeiture action against the defendant currency, independent of the tainted and suppressed evidence. *$493,850.00 in U.S. Currency*, 518 F.3d at 1169; *Driver*, 776 F.2d at 812; *One (1) 1971 Harley-Davidson Motorcycle*, 508 F.2d at 351 (holding that evidence may be introduced in a forfeiture proceeding if it was "derived independently" of an unconstitutional seizure of the res). In other words, the government must demonstrate that at the time it instituted the forfeiture action it had "reasonable grounds," separate from evidence connected to the illegal seizure of the defendant currency, for believing that the cash money was related to an illegal drug transaction. *$493,850.00 in U.S. Currency*, 518 F.3d at 1169*; One (1) 1971 Harley-Davidson Motorcycle*, 508 F.2d at 351. The evidence the government offers us fails to meet this standard.

**[16]** The government points to the knowledge of UMCC's marijuana sales that it gained from LAPD officers' observations on the day of the search, independent of the search itself. These observations include Sergeant Lopez's receipt of a flyer

---

[4]Having excluded the Feil declaration on Fourth Amendment grounds, we need not reach UMCC's other arguments against permitting the government to rely on the declaration, specifically that the government should be judicially estopped from so relying and that the declaration should be set aside on a rationale similar to that employed in *Simmons v. United States*, 390 U.S. 377 (1968), and *Safarik v. United States*, 62 F.2d 892 (8th Cir. 1933).

advertising UMCC, his perception of the scent of marijuana inside the UMCC building, the individuals he saw leaving the Clinic with brown paper bags (as consistent with complaints of marijuana smokers in the neighborhood holding such bags), the statements that employees of UMCC made to Lopez indicating that the Clinic sold marijuana, and another officer's corroborating observations. Although, taken together, this evidence may indicate, as the government contends, that UMCC was selling marijuana, the evidence does not reference the defendant currency and thus cannot alone establish any connection between UMCC's marijuana sales and the currency.

**[17]** According to the government, however, we must consider this evidence in conjunction with the *lack* of evidence suggesting that UMCC had any source of revenue apart from marijuana sales. On this logic, there was probable cause to believe that "any money found on the premises at UMCC represented proceeds of sales of marijuana, and was therefore forfeitable." Yet under our precedent we cannot consider in a forfeiture proceeding the amount of currency that the government illegally seized. *$493,850.00 in U.S. Currency*, 518 F.3d at 1165 (citing *$191,910.00 in U.S. Currency*, 16 F.3d at 1059, 1065). This being so, we are left without a clue as to whether currency of an unknown amount discovered at UMCC was indeed revenue from the Clinic's operations or was, for instance, a small amount of personal cash that an employee had acquired elsewhere and kept in a locked drawer at work. Because we are precluded from considering how much currency the LAPD illegally seized, we cannot agree with the government that the mere presence of currency, of any amount, at UMCC established probable cause to find that such currency was connected to marijuana sales. *See $493,850.00 in U.S. Currency*, 518 F.3d at 1165. Accordingly, the government has failed to show that it had probable cause to institute its forfeiture action against the defendant currency.

### III.   Conclusion

**[18]** Having determined that the government failed to show probable cause, we reverse the District Court's denial of UMCC's motion for summary judgment and order the District Court to enter judgment for UMCC.

**REVERSED and REMANDED.**