# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
May 2, 2018

Lyle W. Cayce
Clerk

No. 17-30383

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RICKEY NIKKI BEENE,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:13-CR-39-1

Before KING, HAYNES, and HIGGINSON, Circuit Judges.

KING, Circuit Judge:*

For the second time, Rickey Nikki Beene asks us to review the legality of a warrantless search of a car parked in his driveway and the admissibility of an incriminating statement he made to police. Last time around, we withheld judgment on both issues and remanded. We reasoned that both issues turned on a question of fact not passed upon below—whether exigencies justified the warrantless car search. *United States v. Beene*, 818 F.3d 157, 165

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-30383

(5th Cir. 2016). On remand, the district court found the car search was justified by exigency and stuck by its original ruling that Beene's statement is admissible. Satisfied with both rulings, we AFFIRM.

## I.

On the evening of June 1, 2012, at around quarter past six, officers of the Haynesville, Louisiana, Police Department were alerted via a Claiborne Parish Sherriff's Office dispatcher that Rickey Nikki Beene was near an apartment complex on Mill Street "pointing a gun at people." Several Haynesville police officers responded to the call and headed towards Mill Street in separate cars. Two minutes after the original call, while the officers were en route, the dispatcher informed them that Beene had left Mill Street in a gray Honda Accord.

One of the responding officers, Danny Mills, knew who Beene was and where he lived. Previously, Mills had received tips that Beene sold drugs. He also had heard from other officers that Beene had been arrested before. Upon learning of Beene's flight from Mill Street, Mills headed towards Beene's house.

At the time, Beene lived in a trailer-house sitting on the northeast corner of an intersection of a state highway and a one-lane road. This house parallels the highway and its front door faces the highway. A gravel driveway feeds off the one-lane road and runs behind the house. This driveway is boxed-in on three sides by two wood fences and the house itself.

Mills approached Beene's house from the highway. As he passed the front of the house, he spotted a silver Lincoln Continental parked in the front yard with a woman sitting inside. Turning left onto the road, Mills's patrol car came face to face with a gray Honda Accord driven by Beene coming the other direction. Before Mills could flash his police lights, Beene pulled into his driveway. Mills pulled up sideways behind him, blocking the driveway's outlet.

2

No. 17-30383

Both men got out of their cars. Mills ordered Beene to put his hands on the Honda's trunk. Beene instead started walking towards Mills. Mills ordered Beene to get on the ground several times and then unholstered his Taser. At that point, Beene complied and got on the ground.

Before Mills could handcuff Beene, the woman from the car in the front yard—who Mills now recognized as Beene's wife, Shauntae Heard—came running around the corner of the house. Mills thought, "she was fixing to try to take me out." Mills commanded her to stop. Heard complied, "but she did not stop hollering." Another officer, Trent Crook, who had rolled up as Beene was getting on the ground, helped Mills handcuff Beene. Beene was given the *Miranda* warning and placed in the back of a police car. According to the police-dispatch log, Beene was in custody within six minutes of the original dispatch call.

With Beene secure, Mills turned his attention to Heard, who was "still a little irate" but "had settled down somewhat." Heard told Mills that the Honda was hers, that there was no gun in it, and that she would not consent to a search. By this point, another officer, Rickey Goode, had arrived in a separate car. Mills brought Goode up to speed on the situation—that Heard would not consent to a search of the Honda. Goode retrieved his drug-sniffing dog from his car and walked it around the Honda. It alerted to the car. Goode and Mills searched the car, which was unlocked. Inside, they found three small bags of marijuana, a small bag of crack-cocaine, and $900 in cash. The officers then opened the car's center console, where they found a loaded .380 caliber handgun.

By then, Chief Anthony Smith had joined the other officers on the scene. He and Trent Crook were standing near Shauntae Heard when she had what looked like a seizure and collapsed. Medical personnel were summoned. But

when they arrived, Heard refused any treatment. Afterwards, Heard was put in the back of a patrol car, unhandcuffed and with the door open.

Chief Smith then summoned Claiborne Parish Detective Adrian Malone to the scene, and the two talked to Heard. After the conversation, Smith announced to the other officers that he had obtained her consent to search the house. Smith would later say that Heard signed a consent form in his and Malone's presence. Hidden in the house, the officers found more drugs (specifically, a larger bag of marijuana, a pill bottle filled with crack-cocaine, a small bag of cocaine, and a small bag of methamphetamines) and a digital scale.

After the house search, Beene and Heard were driven to the Haynesville police station. Sitting in cuffs at the station, Beene started talking to no one in particular. Detective Malone heard Beene say that he carried the gun around that day because he felt threatened by another man. Beene was then interrogated by Malone. Part of this interrogation was recorded. At the start of the recording and outside of Beene's presence, Malone explained his plan for the interrogation: ask Beene why he had the gun, try to get a statement, and see if Beene would cooperate. Malone then entered the interrogation room where Beene was being read his *Miranda* rights by another officer.

Malone began the interrogation by claiming that Beene had already admitted that he had the gun in question. Malone added that he intended to question people living near the Mill Street apartment complex who had reportedly seen Beene waving the gun. Beene explained that he had the gun that day because he felt threatened by another man who had fronted him drugs and now wanted them back.

Beene was indicted for being a felon in possession of a firearm, possession of marijuana, cocaine, crack, and methamphetamine all with intent to distribute, and possession of a firearm in connection with a drug-trafficking

crime. To keep out the relevant evidence of all three offenses, Beene moved to suppress all the drugs, the gun, and his incriminating statements.

The district court held three days of hearings on the motion, taking testimony from the various officers and Shauntae Heard. After the hearing, the court suppressed all the drugs found in Beene's house, concluding that Heard's consent was invalid. Per the court, Chief Smith's testimony that Heard had consented was dubious and there was indisputable evidence that the consent form Heard allegedly signed was falsified. Inexplicably, the Government produced two different versions of the same consent form at the hearing—one with Detective Malone's signature as a witness and one without.

But despite this deceit and misconduct, the district court did not suppress the drugs and gun from the Honda or Beene's statement during the interrogation.[1] According to the court, the search of the Honda was a valid search incident to lawful traffic stop, and the statement was not tainted by the illegal search of Beene's house.

Following this ruling, Beene entered a conditional guilty plea to the felon-in-possession charge, reserving his right to appeal the denial of his suppression motion. Beene received a within-Guidelines sentence of 96 months' incarceration.

On appeal, we vacated Beene's conviction and sentence. *United States v. Beene*, 818 F.3d 157, 159 (5th Cir. 2016). We held that the warrantless car search could not be justified on the district court's chosen grounds—as a search incident to a lawful traffic stop or arrest. *Id.* at 161-62. But we withheld judgment on whether the car search was ultimately illegal. *Id.* at 165. Instead, we held that the dog sniff was legal, that its alert generated probable cause to

---

[1] The district court reserved until trial the question of whether the statement Beene made to no one in particular was admissible. Neither party asks us to disturb this ruling.

No. 17-30383

believe that drugs were in the car, and that this probable cause combined with exigent circumstances could potentially justify the warrantless search. *Id.* at 162-65. In turn, we noted that the admissibility of Beene's statement depended on the legality of the car search. *Id.* at 165. Thus, we remanded to allow the district court to make factual findings on exigency. *Id.*

On remand, the district court, without additional record development, denied Beene's re-urged request to suppress the items from the Honda and his incriminating statement. It found that the search was legal as it was supported by probable cause and occurred during exigent circumstances. Sticking by its prior ruling, the court also held that Beene's confession at the police station was admissible as it was not arrived at by exploiting the illegal house search.

Once again, Beene entered a guilty plea, reserved his right to appeal the suppression issue, and was sentenced to 96 months' incarceration. Beene appeals once more, asking that we deem the car search illegal and his incriminating statement inadmissible.

## II.

We start with the car search and whether it was justified by exigency. Before going forward, however, we must address a key fact dispute: what was Shauntae Heard's status before and during the search of the Honda? Beene says she was detained at the time of the search, and thus her presence did not pose a risk that might justify an immediate search. The Government asks us to defer to the district court's finding that Heard was detained only after the search occurred. Concluding that the district court's finding was free from clear error, we side with the Government.

## A.

We review the district court's factual findings—including its ultimate finding of exigency—for clear error and its legal conclusions de novo. *See Beene*, 818 F.3d at 165; *United States v. Massi*, 761 F.3d 512, 519-20 (5th Cir. 2014).

6

No. 17-30383

Clear error occurs if we are "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). We "must view the evidence 'most favorably to the party prevailing below, except where such a view is inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole.'" *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) (quoting *United States v. Shabazz*, 993 F.2d 431, 434 (5th Cir. 1993)). And where, as here, the district court heard testimony and made credibility findings, our review is highly deferential. *See United States v. Tovar*, 719 F.3d 376, 384 (5th Cir. 2013).

Beene attacks the district court's express finding that Heard was not detained or arrested when the car search occurred. To show this was clear error, Beene relies on Chief Smith's testimony. Smith testified that when he arrived on the scene, Beene was on the ground and Trent Crook was trying to handcuff him. At this point, according to Smith, Heard was standing nearby, yelling at the officers. Per Smith, he went straight up to Heard and ordered her to stop. When the officers carried Beene away in handcuffs, Heard began yelling again and started towards the other officers. When she did this, Smith said he detained her and started to handcuff her. When touched, Heard seized and fell. Emergency personnel were summoned, Heard recovered and refused their aid, and she was placed in the back of a patrol car. While it is not clear from Smith's testimony, presumably in the interim the dog sniff and search occurred. Based on this testimony, Beene claims that Heard was out of commission when the decision to search the Honda was made.

Beene's reliance on Smith's testimony is ill-placed. Smith, as the district court found, was a dishonest and incredible witness. His account of events, according to the district court, was "incredible on multiple points of legal significance" and failed "to comport with almost all of the other officers' versions of the relevant events." To pick out just a single example, Smith swore

7

that Heard consented to the car search, even though this clashed with every other officer's testimony and all the police reports. And it bears repeating that Smith helped falsify the house-search consent form and continued to lie about it at the hearing. Given these worrying circumstances, the district court was not required to accept anything Smith said, and the district court did not clearly err in refusing to credit his testimony over that of more credible witnesses.

What is more, the district court had a solid reason to find Heard was not detained when the car was searched. This timeline accords with Danny Mills's testimony. Mills agreed that Smith arrived at the scene around the time he and Crook were escorting Beene in handcuffs to a police car. But according to Mills, Smith stayed in his car until after the search. Heard had been yelling at Mills and Rickey Goode while they were searching the Honda, pleading with them to stop and not to arrest her husband. After Mills and Goode found the gun and drugs, Mills asked Smith what to do about Heard. Smith said that she should be arrested for resisting an officer, and he and Crook walked over to detain her. It was during this encounter that Heard collapsed. Mills's testimony aligns with the police-dispatch log, which recorded that Heard was placed in custody 17 minutes after Beene. As Smith's story lacks credibility and we have a ready-made alternative which comports with the district court's finding, we cannot discern a clear error.

Convinced that Heard was not detained when Mills and Goode decided to search the Honda, we turn to the main event: was this search valid based on exigency? We conclude it was.

**B.**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches are presumed

unreasonable unless they fall within a delineated exception. *United States v. Guzman*, 739 F.3d 241, 245-46 (5th Cir. 2014). Under the "automobile exception," police with probable cause to believe a vehicle holds contraband may ordinarily search the vehicle without a warrant. *See United States v. Fields*, 456 F.3d 519, 523 (5th Cir. 2006). This exception is "justified by the mobility of vehicles and occupants' reduced expectations of privacy while traveling on public roads." *Beene*, 818 F.3d at 164.

But if a vehicle is parked in the defendant's residential driveway, a warrantless search of the vehicle must—with some exceptions inapplicable here[2]—be supported by probable cause *and* exigent circumstances. *Id.* (first citing *Guzman*, 739 F.3d at 246 n.8; then citing *United States v. Pruett*, 551 F.2d 1365, 1369-70 (5th Cir. 1977)). Our first opinion in this case held that probable cause existed to search the car based on the dog sniff. *Id.* So now, all the action is about exigency.

Exigency, in the broad sense, simply means a state of urgency calling for immediate action. As used here, exigency refers to the existence of a risk that—without an immediate search—injury to officers or others will occur or evidence will be destroyed, lost, or hidden. *See United States v. Blount*, 123 F.3d 831, 837 (5th Cir. 1997) (en banc). Our precedents make it clear, however, that this risk must be "more than a mere possibility." *See United States v. Menchaca-Castruita*, 587 F.3d 283, 295 (5th Cir. 2009). Rather, a finding of exigency "must be based on an officer's reasonable belief that the delay necessary to obtain a warrant will facilitate the destruction or removal of evidence or put officers or bystanders in danger." *Id.* at 295-96. The Government holds the

---

[2] One such exception is "where a residence [is] used to sell drugs rather than 'regularly use[d] . . . for residential purposes.'" *Guzman*, 739 F.3d at 246 n.8 (second and third alteration in original) (quoting *Fields*, 456 F.3d at 525). The Government here does not argue that the residence was not Beene's or that Beene used the residence primarily to sell drugs.

burden of meeting this standard. *United States v. Newman*, 472 F.3d 233, 237 (5th Cir. 2006).

This case slots into a less-developed area of our exigency caselaw. Most of our exigency cases address warrantless house searches, not car searches. While these house-search cases supply general principles, they are not a great fit here given people's diminished expectation of privacy in cars. *See, e.g.*, *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976). Accordingly, we focus our attention on a trio of car-in-driveway cases: *Coolidge v. New Hampshire*, *Carlton v. Estelle*, and *United States v. Reed*.

In *Coolidge v. New Hampshire*, a plurality of the Supreme Court held that a seizure and later search, without a valid warrant, of the defendant's car parked in his driveway could not be justified by exigency. 403 U.S. 443, 447, 462 (1971) (plurality opinion). There, the police knew for at least two weeks that the car played a probable role in the crime. *Id.* at 446-47, 460. The defendant was also aware that he was a suspect and "had ample opportunity to destroy any evidence." *Id.* at 460. No indication existed that the defendant intended to flee; instead, he had been "extremely cooperative." *Id.* The opportunity for a search was not "fleeting" as the police knew the car was regularly parked in the defendant's driveway. *Id.* The objects the police searched for—particles of gunpowder—"were neither stolen nor contraband nor dangerous." *Id.* at 448, 460. The night of the search, neither the defendant nor his wife could access the car once the police arrived to execute the warrant—the defendant was quickly arrested and his wife was escorted away and watched. *Id.* at 460-61. After the defendant and his wife were removed, two officers guarded the premises until the car was towed. *Id.* at 461.

Following *Coolidge*, we ruled the other way in *Carlton v. Estelle*, holding that exigencies justified a warrantless search of a car parked on the street in front of the defendant's house. 480 F.2d 759, 760, 763-64 (5th Cir. 1973). There,

in the hours after an at-gunpoint rape in a car, police followed leads that brought them to the defendant's house, where a similar looking car was parked outside. *Id.* at 760. We upheld the officers' decision not to obtain a warrant before heading to the defendant's house—"the trail was hot," they had probable cause to believe the defendant was armed and had just committed a rape, and they did not know where the defendant or his car were until they arrived at his house. *Id.* at 762. Until they arrived, the officers "had missed no genuine opportunity to obtain a valid warrant to search the car." *Id.* at 763. We also upheld the officers' decision to then search the car without a warrant. *Id.* at 764. In doing so, we relied on the fact that the defendant's mother and wife, who were relatively close by, both knew that the defendant was in trouble. *Id.* at 763. The wife, in particular, was at the house when the defendant was arrested, was not herself under arrest, and had not been asked to come to the police station—that is, "her freedom was not restricted in any way." *Id.* at 760. Based on this, an immediate search was permitted because the wife "was clearly in a position to exercise dominion over the car for innocent reasons or otherwise." *Id.* at 763.

The final of this trio is *United States v. Reed*, where we upheld a warrantless car-in-driveway search based on exigency. 26 F.3d 523, 525, 529-30 (5th Cir. 1994). There, after an armed bank robbery, police tracked a device hidden in the stolen money to the trunk of the defendant's car. *Id.* at 525. Police then entered the defendant's house, handcuffed him and his wife, took the keys to the car, and opened the trunk. *Id.* Inside, they found the money, a gun, and clothes like the ones the robber wore. *Id.* We held that up until the defendant and his wife were handcuffed, the officers "missed no opportunity to obtain a valid warrant." *Id.* at 529. And once the husband and wife were handcuffed, the exigency did not pass. *Id.* at 530. We cited three separate risks to support an immediate search. *Id.* First, by failing to remove the tracker, the device

could interfere with the police's ability to track another possible bank robbery. *Id.* Second, by not immediately searching the car, the police could not determine whether an accomplice was making off with a different part of the money. *Id.* And third, one of the many neighbors gathered outside to witness the events could try to access the car. *See id.*

Turning to the case before us, Beene has no plausible argument that the officers should have obtained a warrant before he was handcuffed. The officers were in a rapidly changing situation, faced with a potentially armed suspect, and Beene's trail was hot. They did not know exactly where he was or have a precise description of the car he was driving, so applying for a warrant made little sense. The dispatch log reveals that only six minutes passed between the initial dispatch call and Beene's arrest. Up until Beene was handcuffed, the officers missed no genuine opportunity to get a warrant. *See Reed*, 26 F.3d at 529; *Carlton*, 480 F.2d at 763.

Appearing to acknowledge this, Beene focuses on the time after he was handcuffed. He argues that after this point, the exigency passed, and the police should have got a warrant before searching the Honda. He posits that the police did not even have to leave the scene because Louisiana law authorizes telephonic warrants. *See* La. Code Crim. Proc. Ann. art. 162.1(B), (D).

We do not agree. It is true that Beene's detention removed the risk that he would access the car and shoot the gun or hide the drugs. But his detention coincided with Heard's arrival, creating new risks. Heard plays the part of the undetained wife in *Carlton* or the nosy neighbors in *Reed*. When the decision to search the car was made, Heard, like Carlton's wife, knew of the car, knew her husband was in trouble, and could reach the car. In many ways, Heard posed more of a problem for the officers than Carlton's wife. There, "the record [did] not suggest what" the wife "would have done if the officials had not exercised dominion over the car immediately upon the arrest." *Carlton*,

480 F.2d at 763. Here, the record does provide a suggestion—she would have gone for the car. When Heard saw that trouble was afoot, she ran to the scene. She did stop on command, but she kept yelling at the officers not to arrest Beene and not to search the car. When she was eventually detained, according to Trent Crook, it was because she "was acting as if she wanted to get to the vehicle or Officer Mills." When Crook tried to grab her, according to him, she jerked away and tried to go around him towards the car.[3]

But to what extent could Heard realistically "exercise dominion over the car"? *See Carlton*, 480 F.2d at 763. At least two officers were on the scene when she was alerted to her husband's predicament and more were swarming. The Honda was blocked in. Mills had already showed some willingness to deploy his Taser. No officer testified that he was unsure he could take Heard down if it came to it. And, as later events bear out, Heard could be detained without too much trouble. Was the scene really unsecured when the police decided to search the car?

We rejected this exact reasoning in *Reed*. There, the defendant claimed that the officers could have posted a guard to secure the car while others got a warrant. *Reed*, 26 F.3d at 530. Our rejoinder was simple: "if a warrantless seizure is permissible, a warrantless search is permissible as well." *Id.* This insight flows from *Chambers v. Maroney*, where the Supreme Court refused to sort out which was more intrusive for Fourth Amendment purposes: a seizure

---

[3] While the lack of evidence on the availability of and turnaround time for telephonic warrants was an oversight by the Government, it is not a dispositive one in this case. Ordinarily, the Government must "introduce evidence of the time required to obtain a telephonic warrant and the availability of that warrant." *United States v. Berick*, 710 F.2d 1035, 1038 (5th Cir. 1983). But this requirement is qualified. Such evidence is not required where the exigencies "are so imperative that recourse to even a telephone warrant was unavailable." *Id.* at 1038-39. This is just such a case. Heard was just five or six feet from the car. Disengaging to call in a warrant, even if it took just a few minutes, would give Heard a clear shot at the car and the items inside.

to secure a later search or an immediate search. *See* 399 U.S. 42, 51-52 (1970).

Ex ante, neither can be deemed less intrusive, so a defendant cannot claim the officers should have taken one path instead of the other. Or, as we put it in *Carlton*, "the *Chambers* rule means that the warrantless seizure alternative was not a constitutionally significant one." 480 F.2d at 762.[4]

Here, the options the police had to prevent Heard's access to the Honda—in addition to jeopardizing her safety and theirs—would constitute a seizure of the car, or a "meaningful interference" in Heard's "possessory interests in" the car. *See United States v. Jacobsen,* 466 U.S. 109, 113 (1984). Presented with two options—intruding or continuing to intrude on Heard's possessory right to her car and intruding on Beene's privacy right in the car's contents—we cannot say the police, in a constitutional sense, chose wrongly.

## III.

Our next task is to address Beene's incriminating statement and whether it should have been suppressed. Beene complains that his statement made during police interrogation was tainted by the prior illegal search of his house.[5] The district court held, and the Government urges us to conclude, that the statement is admissible as it was not derived from exploitation of the prior

---

[4] Similarly, Beene cannot prevail by arguing that the officers had *already* effectively seized the vehicle by the time the search occurred by blocking it off and ordering Heard to stop when she approached. We rejected this argument in *Carlton*. There, Carlton argued that even if exigency existed at some point, it passed when the officers "effectively made a warrantless seizure of the car and were therefore in a position to prevent its removal." *Carlton*, 480 F.2d at 764 n.1. We granted that an effective seizure may have occurred. *Id.* But this did not mean that the legal warrantless seizure made the warrantless search illegal. *Id.* We noted that "[i]f a warrantless seizure is necessary to remove the exigencies that would justify an immediate warrantless search, a warrantless search subsequent to seizure is permissible." *Id.*

[5] We need not consider Beene's other argument—that the warrantless search of the car tainted his later confession. As we just held, the car search was legal, and thus it cannot taint his confession.

No. 17-30383

illegal search.[6] We ultimately side with the Government. Put simply, the record amply demonstrates that Beene's confession was not a product of the illegal house search.

The exclusionary rule supplies the typical remedy for Fourth Amendment violations: suppression of the evidence at trial. *See Mapp v. Ohio*, 367 U.S. 643, 648 (1961). "The exclusionary rule reaches not only the evidence uncovered as a direct result of the violation, but also evidence indirectly derived from it—so-called 'fruit of the poisonous tree.'" *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018) (quoting *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016)). Physical evidence as well as verbal statements acquired downstream of a violation can be such fruit. *See Wong Sun v. United States*, 371 U.S. 471, 485 (1963).

While "safety-valve doctrines"—namely, independent source, inevitable discovery, and attenuation of the taint—may allow a poisoned fruit's admission, *see Mendez*, 885 F.3d at 909, an obvious component of the doctrine sometimes gets overlooked: evidence is only susceptible to exclusion if it is a *product* of the police's illegal conduct, *see Segura v. United States*, 468 U.S. 796, 815 (1984); *see also Hudson v. Michigan*, 547 U.S. 586, 592 (2006) ("Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression."). Excluding evidence in the absence of but-for causality would, by definition, put the Government in a worse place than if no violation occurred—a result at odds with the balance the Supreme Court has struck

---

[6] The district court seems to have engaged in an attenuation-of-the-taint analysis. However, such "attenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the product of illegal governmental activity.'" *New York v. Harris*, 495 U.S. 14, 19 (1990) (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)). But given the similarity between the attenuation and causality inquiries, and because we may affirm on any grounds supported by the record, *see Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009), we will not remand for a second time.

between "deterring unlawful police conduct and the public interest in having juries receive all probative evidence." *See Nix v. Williams*, 467 U.S. 431, 443 (1984); *see also United States v. Singh*, 261 F.3d 530, 535 (5th Cir. 2001).

A defendant's claim that his statement should be suppressed based on a prior Fourth Amendment violation requires us to be attentive to the nature of that violation. This is because the "analysis that applies to illegal detentions differs from that applied to illegal searches." *See United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (en banc); *see also* 6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 11.4(c) (5th ed. 2012) ("[T]he two situations are quite different."). When the underlying violation is an illegal detention unsupported by probable cause and the defendant confesses during that detention, causation is usually clear. But for the illegal detention, the defendant would not be in custody, confessing to police.[7] But when the underlying violation is an illegal search, the causal link between the search and the statement can be harder to identify. It is not always clear that the search influenced the defendant's decision to confess or what he confessed to. Courts searching for a causal link have looked at: what the officials already had on the defendant,[8] what evidence the illegal search

---

[7] But-for causality, in such circumstances, is usually apparent, so most illegal-detention cases go straight to the attenuation-of-the-taint analysis. *See, e.g.*, *Taylor v. Alabama*, 457 U.S. 687, 690-91 (1982); *Dunaway v. New York*, 442 U.S. 200, 216-19 (1979); *Brown v. Illinois*, 422 U.S. 590, 604-05 (1975); *Wong Sun*, 371 U.S. at 484-87.

[8] *See United States v. Riesselman*, 646 F.3d 1072, 1079-80 (8th Cir. 2011) (finding the confession was not a product of the suppressed drugs in part because the defendant was also confronted with legally discovered weapons and drug transactions); *United States v. Green*, 523 F.2d 968, 972 (9th Cir. 1975) (finding the suppressed evidence's role in the defendant's confession was "[d]e minimis" because the defendant was also confronted with legally discovered evidence of the same type and greater quantity); *cf. Mendez*, 885 F.3d at 914 (finding attenuation in part because the defendant "was already under the impression that there was a significant amount of legally obtained evidence against him"); *United States v. Patino*, 862 F.2d 128, 133-34 (7th Cir. 1988) (finding the defendant's second confession was not a product of her illegally obtained first confession when "she previously had been told that her involvement in the robberies could be proved without the confession").

produces,[9] whether the officials confront the defendant with the ill-gotten evidence,[10] and whether the defendant is influenced by the knowledge that officials have already seized the evidence.[11] But the ultimate question remains the same: would the statement have been obtained regardless of the illegality? *See Segura*, 468 U.S. at 815; *United States v. Jenson*, 462 F.3d 399, 408 (5th Cir. 2006).

This is a legal question we review de novo. *See United States v. Moore*, 329 F.3d 399, 402 (5th Cir. 2003). But when examining the evidence, we view it in a light most favorably to the party who prevailed below. *See id.* The defendant "must go forward with specific evidence demonstrating taint," even though the Government holds "the ultimate burden of persuasion to show that its evidence is untainted" once a Fourth Amendment violation is established. *See United States v. Webster*, 750 F.2d 307, 314-15 (5th Cir. 1984) (quoting *Alderman v. United States*, 394 U.S. 165, 183 (1969)).

---

[9] *Compare Crawford*, 372 F.3d at 1057-58 (finding no but-for causality in part because the illegal search was unfruitful), *with United States v. Shetler*, 665 F.3d 1150, 1158 n.3 (9th Cir. 2011) (finding but-for causality in part because the "physical evidence obtained in the illegal search was significantly greater and more inculpatory than" the evidence obtained in an earlier legal search).

[10] *Compare United States v. Marasco*, 487 F.3d 543, 547-48 (8th Cir. 2007) (finding no but-for causality when the record did not show that the defendant was confronted with the illegally seized evidence), *with Shetler*, 665 F.3d at 1158 (finding but-for causality in part because there was "no evidence in the record that [the officials] did not also confront [the defendant] with the illegally seized evidence in their questioning"), *and United States v. Davis*, 332 F.3d 1163, 1171 (9th Cir. 2003) (finding the illegal search "led directly" to the incriminating statement when police questioned the defendant about the illegally seized gun and he admitted to owning it).

[11] *Compare Riesselman*, 646 F.3d at 1079 (finding the confession was not a product of the suppressed drugs in part because the defendant's only evidence that his confession was influenced by the illegal seizure was his own self-serving testimony), *with Shetler*, 665 F.3d at 1158-59 (finding but-for causality in part because the defendant was only aware of the illegal search which revealed an extensive drug operation and not the prior legal search which revealed only a part of the operation), *and United States v. $186,416.00 in U.S. Currency*, 590 F.3d 942, 951 (9th Cir. 2010) (finding the defendant's declaration—which he submitted for "the express purpose of securing the return of the illegally seized currency"— was a product of the illegal search and seizure).

Here, the district court—though rightly perturbed by Chief Smith and Detective Malone's "flagrant and egregious" falsification of Heard's consent to the house search—correctly found no causal link between the illegal house search and Beene's later statement. Recall that before either search occurred, Beene was legally arrested for resisting Mills's commands. He was present while the officers legally searched his car and seized the gun, three bags of marijuana, and a bag of crack-cocaine. Beene's interrogation did follow the illegal house search which uncovered larger quantities of drugs. But that is all Beene has. This temporal sequence is the only indication that but for the illegal search, Beene would not have admitted to possessing the gun. On the other hand, substantial evidence shows that Beene would have spilled the beans whether the house was searched or not.

We find it particularly relevant that, as the district court found, Beene was not confronted with the illegally seized drugs. Instead, his interrogation focused on the gun and why Beene had it that day. Further, the pressure applied during the interrogation was (at least constitutionally speaking) fair game. Detective Malone told Beene that the police found the gun in the car, explained that Beene's earlier unsolicited remark was an admission that he possessed the gun, and mused that he could find witnesses to corroborate that Beene was waving the gun. We find it significant that all three points of pressure immediately preceding Beene's confession related to legally obtained information. This is strong evidence that without the illegal house search, Beene would still have made his incriminating statement.

And not only did Beene face substantial lawful pressure, but it is not even clear that Beene knew the police found the hidden drugs in his house. Even assuming he did know, we cannot conclude that his awareness made a difference. Beene did not testify that he confessed about the gun because he believed—after the drugs in the house were seized—that staying quiet would

18

be futile. And such a story, if given, would be hard to accept. While the quantity of drugs in the house was greater than that found in the car, the circumstances made the drugs in the car more potent evidence. The drugs in the car were more clearly linked to Beene (he was seen driving the car moments before they were discovered), and were packaged in separate bags (making the Government's case for drug distribution). In sum, without the fabrication of Heard's consent and the resulting illegal house search, Beene's position and the pressures he faced would be largely unchanged. He still would be legally in custody, facing serious and well-founded drug and gun charges, and could appropriately be questioned about the seized gun and the drugs from his car.

Beene's search for a causal connection between his statements and the illegal conduct turns up empty. True, Beene's interrogation followed the illegal search. But (despite what a gambler on a hot streak might tell you) "sequence should not be confused with consequence." *Crawford*, 372 F.3d at 1058. Also true, the house search happened around the same time as the car search and the interrogation. Obviously, however, the taint from the later house search could not reach back in time and infect the earlier car search. And the temporal proximity between the house search and the interrogation, by itself, cannot demonstrate causation. "The exclusionary rule forbids the government from using evidence *caused* by an illegal seizure, not evidence found around the time of a seizure." *United States v. Clariot*, 655 F.3d 550, 555 (6th Cir. 2011). Finally, while Malone's misconduct makes us wary of his retelling of the interrogation, the district court was also aware of his misconduct yet still credited his story (in large part due to the recording which it found corroborative). Because we owe deference to this finding, we will not unsettle it with speculation of greater misdeeds.

Smith and Malone's misconduct is deeply concerning. But this alone does not provide a ground to suppress Beene's statement. Instead, given the sheer

lack of evidence that the illegal house search influenced Beene's decision to talk, as well as the strong evidence that it did not, the appropriate and only available sanction is suppression of the drugs found in the house.

**\* \* \***

For the foregoing reasons, Beene's conviction and sentence are AFFIRMED.