**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellant*,

v.

TRISTON HARRIS STEINMAN,

*Defendant - Appellee*.

No. 23-1703

D.C. No.
3:22-cr-00068-
ART-CLB-1

OPINION

Appeal from the United States District Court
for the District of Nevada
Anne R. Traum, District Judge, Presiding

Argued and Submitted December 5, 2024
San Francisco, California

Filed March 5, 2025

Before: MILAN D. SMITH, JR. and PATRICK J.
BUMATAY, Circuit Judges, and GEORGE H. WU, Senior
District Judge.[*]

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge George H. Wu

---

[*] The Honorable George H. Wu, United States Senior District Judge for
the Central District of California, sitting by designation.

**SUMMARY**[**]

**Criminal Law**

The panel reversed the district court's order suppressing evidence seized from Triston Harris Steinman's car following a traffic stop in a case in which Steinman is charged with being a felon in possession of ammunition and possession of unregistered firearms.

The panel held that the district court erred in concluding that Nevada State Trooper William Boyer violated Steinman's constitutional rights by unlawfully prolonging the traffic stop. Trooper Boyer had reasonable suspicion of an independent offense after he learned of Steinman's felony conviction, and he did not measurably prolong the traffic stop up to that point.

The panel held that the district court erred in concluding that Trooper Boyer lacked probable cause to seize Steinman's automobile. To the contrary, Trooper Boyer had probable cause to believe that the automobile contained evidence of two independent offenses—possession of ammunition in violation of federal law and possession of firearms in violation of Nevada law. As to the issue of the "cross-enforcement" of the Fourth Amendment—whether an officer employed by one government can justify a search or seizure based on a violation of a different government's law—the panel concluded that the fact that possession of

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

ammunition by a felon is illegal only under federal law poses no barrier to Trooper Boyer's seizure of the car.

The panel held that the district court erred in concluding that warrant overbreadth requires suppression. The panel did not disturb the district court's ruling that the search warrant was unconstitutionally overbroad, but it was nonetheless error for the district court to exclude the fruits of the search because the search of Steinman's vehicle would have been permissible under the automobile exception to the Fourth Amendment's warrant requirement.

District Judge Wu concurred with the majority opinion except for Part II.B.1. He wrote that the panel need not—and should not—break new ground by addressing the undeveloped and potentially sweeping "cross-enforcement" issue.

## COUNSEL

Peter H. Walkingshaw (argued), Assistant United States Attorney; Office of the United States Attorney, United States Department of Justice, Reno, Nevada; Adam M. Flake and Robert L. Ellman, Appellate Chiefs; Jason M. Frierson, United States Attorney; Office of the United States Attorney, United States Department of Justice, Las Vegas, Nevada; for Plaintiff-Appellant.

Jeremy C. Baron (argued), Assistant Federal Public Defender; Rene L. Valladares, Federal Public Defender; Federal Public Defender's Office, Las Vegas, Nevada; Sean A. McClelland, Assistant Federal Public Defender, Federal Public Defender's Office, Reno, Nevada; for Defendant-Appellee.

# OPINION

M. SMITH, Circuit Judge:

The district court suppressed evidence seized from Triston Harris Steinman's car on multiple grounds, including that a law enforcement officer violated his Fourth Amendment rights during a traffic stop. The Government appeals the suppression order, contending that Steinman's constitutional rights were not violated and that the evidence should not be suppressed. We agree with the Government. Exercising appellate jurisdiction pursuant to 18 U.S.C. § 3731, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   The Traffic Stop and Subsequent Search

This case arises out of a traffic stop conducted on August 12, 2022, by Trooper William Boyer of the Nevada State Police. While Trooper Boyer was driving on a highway in Wells, Nevada, he observed a gray BMW driving in the opposite direction and determined that the BMW was travelling at 89 miles per hour, well above the posted speed limit. Trooper Boyer turned on his emergency lights and, at approximately 3:51pm, pulled over the BMW, which was driven by Defendant Triston Harris Steinman. The events that followed were recorded by Trooper Boyer's body-worn camera and dashcam.

While approaching the BMW, Trooper Boyer observed movement within the vehicle's cab, which he determined to be Steinman moving around within the cab. Arriving at the passenger-side window, Trooper Boyer observed an ammunition box on the front right floor of the vehicle and items covered by a blanket in the back seat. Trooper Boyer

requested Steinman's license and registration, and Steinman told Trooper Boyer that he was moving from Washington to Utah, which involved passing through Nevada. Trooper Boyer inquired about the move while inspecting Steinman's documentation. In response to Trooper Boyer's question, Steinman said that there was "stuff" under the blanket in the back seat. When Trooper Boyer inquired further, Steinman denied that there was anything that he wished to hide in the back seat and reiterated that it was only his "stuff." Steinman admitted having ammunition but denied having guns in the car. Trooper Boyer returned to his patrol car to run a driver's license check, which would show if Steinman's license was valid and whether Steinman had any outstanding warrants or protection orders.

Trooper Boyer approached the BMW again to check the VIN number to make sure it matched the registration and so he could request Steinman's insurance information. Steinman did not have his insurance information, and he requested it telephonically from his girlfriend. Trooper Boyer asked Steinman to come sit in his patrol car, but Steinman demurred, asking if he could just receive the citation instead. Trooper Boyer asked, "Don't want to talk to me?" and informed Steinman that he had the authority to order Steinman out of the BMW. Following Trooper Boyer's instructions, Steinman left the BMW and walked to the patrol car. Steinman sat in the right front seat of the patrol car and, shortly thereafter, showed Trooper Boyer the insurance information that he received from his girlfriend.

Trooper Boyer accessed his ticket-writer application. He observed that Steinman appeared to be sweating. The cruiser was air-conditioned but the passenger door was open for the first few minutes of Steinman being inside. Trooper Boyer

conversed with Steinman about his travel plans and his history while working on the citation on the computer.

Approximately ten minutes into the stop, Trooper Boyer requested a criminal history check on Steinman from dispatch, and Steinman again asked if he could just get a ticket and leave. Trooper Boyer indicated to Steinman that the ticket-writing process was not yet completed. The two continued conversing while Trooper Boyer worked on the citation. At about 4:05pm, about three minutes after requesting it, Trooper Boyer received Steinman's criminal history record. Trooper Boyer reviewed the criminal history record for about three-and-a half to four minutes, observing that there was at least one entry listed as "felony with a guilty disposition." During his review of the records, Trooper Boyer effectively paused the citation-writing process. He continued conversing with Steinman while reviewing the records, including about the parameters of the ticket that he was going to issue.

Trooper Boyer then returned to writing the citation. He signed the citation at about 4:10 pm, approximately nineteen minutes into the stop. He continued filling out other fields in the ticket-writer application and chatting with Steinman, including asking Steinman how he obtained the money to purchase his BMW. Trooper Boyer asked Steinman whether he had ever been in any trouble, and pressed him after Steinman responded, "a little bit." Steinman stated that he had an assault charge but that he did not think he had any felonies besides a juvenile one. Trooper Boyer asked Steinman if he still shot guns, and Steinman responded, "not really," and explained that he just had ammunition because he was bringing it home. Shortly afterwards, Trooper Boyer continued filling out the citation and explained the fine that Steinman would be facing.

At approximately 4:20 pm—just under thirty minutes into the stop—Trooper Boyer informed Steinman that Steinman had some felonies on his background and ammunition in his BMW, which provided "a little" probable cause to search the vehicle. He asked for Steinman's consent to search the BMW, but Steinman refused and recanted his earlier admission that there was ammunition in the car, saying that the ammunition box was empty. Steinman also accused Trooper Boyer of investigating him and asking him questions instead of just giving him a ticket.

Other officers, including a sergeant, arrived at Trooper Boyer's request. While Steinman waited on the side of the road talking on his cell phone, Trooper Boyer (1) unsuccessfully reached out to a K-9 unit, (2) reached out to dispatch to confirm that Steinman had felony convictions rather than just felony charges, and (3) did a few other tasks related to the seizure, including requesting a tow.[1] At 4:38pm, Trooper Boyer explained the citation to Steinman and returned some of his documentation. Trooper Boyer then explained that the BMW was being seized and that Steinman would not have access to it.

At approximately 5:25pm—about ninety minutes after the start of the stop—Steinman received his license back and began to walk towards the nearest town (although he had

---

[1] Trooper Boyer also called a number of his fellow officers and a justice of the peace regarding the existence of probable cause and the procedure for filling out a search warrant. Steinman attaches importance to these events, but, as with the other events occurring during the time frame, these calls are ultimately irrelevant to the ultimate question before us because these calls occurred *after* Trooper Boyer developed reasonable suspicion and probable cause. In any event, any statements by Trooper Boyer suggesting that he had a subjective doubt as to whether there was probable cause do not shed any light on the issues before us.

been offered a ride). The tow company arrived shortly thereafter and took the BMW. The sergeant picked Steinman up and drove him to town.

Trooper Boyer authored a request for a search warrant. A lay justice of the peace approved Trooper Boyer's application for a search warrant, and officers searched the BMW. They recovered a substantial cache of weapons and other incriminating evidence; specifically, they found thirty-eight firearms, silencers, ammunition, marijuana, and drug paraphernalia. That included one loaded firearm located directly beneath the driver's seat, within Steinman's easy reach.

## II. Procedural History

Steinman was charged by superseding indictment with (1) being a felon in possession of ammunition, *see* 18 U.S.C. § 922(g)(1), and (2) possession of unregistered firearms, 26 U.S.C. § 5841, 5861(d), 5871.

Steinman moved to suppress the evidence collected as a result of the traffic stop, contending that his Fourth Amendment rights were violated. Steinman argued, *inter alia*, that (1) even if the stop was justified at its inception, it was unconstitutionally prolonged without the required reasonable suspicion; (2) the warrantless seizure of his BMW was not supported by probable cause; and (3) the search warrant ultimately obtained was facially overbroad and otherwise invalid.[2] According to Steinman, the fruit of

---

[2] Steinman also raised other arguments, including that the stop itself was not supported by reasonable suspicion because there was insufficient evidence that he was speeding and that his statements to Trooper Boyer should be suppressed because he was not given *Miranda* warnings. Steinman does not renew these arguments in his appellate briefing, though, and they are unpersuasive in any event.

these constitutional violations—namely, the guns and ammunition—should be suppressed.

The Government opposed Steinman's motion to suppress. The Government first argued that the traffic stop was not unconstitutionally prolonged because criminal history checks during a traffic stop are objectively reasonable and, even if the stop was prolonged, that prolongation was properly supported by reasonable suspicion. It also argued that there was probable cause to seize Steinman's car because (1) Trooper Boyer had probable cause to believe that there were firearms in the car, the possession of which by Steinman would be a crime under state law and (2) Trooper Boyer had probable cause to suspect that there was ammunition in the car, which violates a federal statute, 18 U.S.C. § 922(g)(1). Finally, the Government contended that the search warrant was valid, officers relied upon the warrant in good faith, and that, even if the warrant were invalid, Steinman's car could have been searched under the automobile exception because of the existence of probable cause.

The district court held an evidentiary hearing on Steinman's motion to suppress. Trooper Boyer testified at the hearing, and a variety of exhibits were admitted, including the search warrant affidavit and warrant itself, Steinman's criminal history records, and the officers' police reports. Among other things, Trooper Boyer testified that he had made thousands of traffic stops during his time in law enforcement, and that, in his experience, the usual length for a traffic stop was around fifteen minutes, although there was considerable variation. Trooper Boyer testified that he did not, as a routine matter, request criminal history when checking documentation during a traffic stop; instead, he did so only when the circumstances made him suspicious. He

specifically testified that he ran the criminal history check on Steinman because he had become "suspicious" of Steinman.

Later that same day, the district court issued an oral ruling granting the motion to suppress. The district court first concluded that there was a violation of Steinman's Fourth Amendment rights by the unconstitutional prolongation of the traffic stop. Specifically, it reasoned that "the traffic stop was unreasonably prolonged when Mr. Steinman was removed from his vehicle for the purpose of interrogation," and was further prolonged "by the detailed questioning of Mr. Steinman" as well as the "criminal history checks," which delayed the writing of the speeding citation. The district court concluded that this was not a case where a routine criminal-history check was conducted for officer safety. And even if the original criminal records check was justified, the citation-writing process was still slowed by Trooper Boyer's investigation and research on the criminal history. The district court further concluded that the prolongation was not supported by reasonable suspicion.

Next, the district court concluded that the seizure, search, and prolongation could not be justified by Trooper Boyer's interest in enforcing the federal prohibition on possession of ammunition by a felon because Trooper Boyer was a state law enforcement officer. Relatedly, it reasoned that there was no probable cause to seize the vehicle based on an alleged violation of either federal or state law.

As to the search warrant, the district court concluded that it was not supported by probable cause and that it was

impermissibly overbroad in violation of constitutional safeguards. The district court finished by remarking:

> So to be clear, I am suppressing on multiple independent grounds. There was a prolonged detention unsupported by reasonable suspicion that far exceeded the scope of a normal traffic stop and mission. There was no probable cause to seize the vehicle. The warrant is invalid and cannot be saved by severance or good faith.

The Government timely filed an appeal of the suppression order.

## JURISDICTION AND STANDARD OF REVIEW

The district court had original jurisdiction over this case pursuant to 18 U.S.C. § 3231. We have jurisdiction over the Government's appeal of the suppression order pursuant to 18 U.S.C. § 3731.

"We review de novo the district court's ruling on a motion to suppress and for clear error any underlying findings of historical fact." *United States v. Willy*, 40 F.4th 1074, 1079 (9th Cir. 2022). "We must 'give due weight to inferences drawn from th[e] facts by resident judges and local law enforcement officers.'" *Id.* (alteration in original) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)).

## ANALYSIS

The Government challenges the district court's order granting Steinman's motion to suppress on multiple bases. *First*, the Government argues that the district court erred in its conclusion that Trooper Boyer unconstitutionally

prolonged the traffic stop without the requisite reasonable suspicion, in part because it improperly considered Trooper Boyer's subjective motivation. *Second*, the Government contends that the district court erred in concluding that Trooper Boyer lacked probable cause to seize Steinman's BMW.

Steinman disagrees with the Government on those two points and further insists that because the Government failed to challenge the district court's ruling that the search warrant was overbroad—an "independent basis for suppression"— we must uphold the suppression order. In response to this additional argument, the Government insists that the overbreadth of the warrant is immaterial because Trooper Boyer had probable cause to believe that the BMW contained evidence of a crime, so it could be searched without a warrant pursuant to the automobile exception to the Fourth Amendment's warrant requirement.

We agree with the Government on all three points, and we reverse the suppression order.

## I.  Whether the Traffic Stop was Unconstitutionally Prolonged

The district court concluded that the fruits of the traffic stop could be suppressed because Trooper Boyer unconstitutionally extended the traffic stop without the requisite reasonable suspicion. This was error.

### A.  Legal Standards

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). "Under the Fourth Amendment, a seizure for a traffic stop is 'a relatively brief encounter,' 'more analogous to a so-called *Terry* stop than to a formal

arrest.'" *United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023) (quoting *Rodriguez*, 575 U.S. at 354). "To be lawful, a traffic stop must be limited in its scope: an officer may 'address the traffic violation that warranted the stop,' make 'ordinary inquiries incident to the traffic stop,' and 'attend to related safety concerns.'" *Id.* (quoting *Rodriguez*, 575 U.S. at 354–55). "The stop may last 'no longer than is necessary to effectuate' these purposes and complete the traffic 'mission' safely." *Id.* (quoting *Rodriguez*, 575 U.S. at 354–55); *see also Rodriguez*, 575 U.S. at 354 ("Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.").

Lawful inquiries incident to a traffic stop can include checking a driver's license, determining whether there are outstanding warrants, and inspecting the automobile's registration and proof of insurance. *See United States v. Ramirez*, 98 F.4th 1141, 1144 (9th Cir. 2024). Attending to related safety concerns includes "certain negligibly burdensome precautions in order to complete [the traffic] mission safely." *Id.* (quoting *Rodriguez*, 575 U.S. at 356). "So, for example, an officer may order the driver of a vehicle to exit the vehicle during a traffic stop." *Id.*; *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (per curiam). These safety precautions fall within the mission of the traffic stop because "[t]raffic stops are 'especially fraught with danger to police officers.'" *Rodriguez*, 575 U.S. at 356 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)).

Building on these principles, a traffic stop "'can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a' ticket for the violation." *United States v. Hylton*, 30 F.4th 842, 847 (9th

Cir. 2022) (quoting *Rodriguez*, 575 U.S. at 354); *see also Ramirez*, 98 F.4th at 1144 ("[A] traffic stop 'exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.'" (quoting *Rodriguez*, 575 U.S. at 350)). However, "the Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention." *Rodriguez*, 575 U.S. at 354. But an officer may not make unrelated investigation inquiries "in a way that prolongs the stop." *United States v. Landeros*, 913 F.3d 862, 866 (9th Cir. 2019) (quoting *Rodriguez*, 575 U.S. at 355). That includes investigations that result in only a "de minimis" prolongation of the stop. *See Rodriguez*, 575 U.S. at 355–56; *United States v. Nault*, 41 F.4th 1073, 1078 n.2 (9th Cir. 2022). That is because "[o]n-scene investigation into other crimes[] . . . detours" from the traffic-stop mission. *Rodriguez*, 575 U.S. at 356. "So too do safety precautions taken in order to facilitate such detours." *Id.*

That is not to say, of course, that law enforcement officers can never extend a stop to investigate matters other than the original traffic violation without running afoul of the Fourth Amendment. To the contrary, "a stop 'may be extended to conduct an investigation into matters other than the original traffic violation' so long as 'the officers have reasonable suspicion of an independent offense.'" *Taylor*, 60 F.4th at 1239 (quoting *Landeros*, 913 F.3d at 867).

In short, if a traffic stop is constitutionally justified at its inception—which is not seriously disputed in this appeal—our analysis is twofold. Was the stop prolonged, and, if so, was the prolongation justified by reasonable suspicion based on the information available at that juncture? *See Landeros*, 913 F.3d at 867–88; *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015).

## B. Discussion

Applying these rules here, we conclude that Steinman's Fourth Amendment rights were not violated by an unconstitutional prolongation of the traffic stop. Our conclusion flows from two key premises. *First*, nothing up until the point when Trooper Boyer finished reviewing Steinman's criminal history and learned that he had a felony conviction (approximately 4:08pm according to the body-camera footage) constituted an unconstitutional prolongation of the traffic stop. All of the actions taken by Trooper Boyer up until that point either (1) were within the legitimate mission of the traffic stop, including protecting officer safety or (2) did not prolong the traffic stop. *Second*, after Trooper Boyer reviewed the criminal history and learned that Steinman had a felony conviction, he had reasonable suspicion to believe that Steinman was engaged in criminal activity—namely, that Steinman possessed firearms in violation of Nevada law. Thus, even if we assume that Trooper Boyer did prolong the stop at some point after he learned that Steinman had a felony conviction, it is of no moment because he was entitled to do so based on his reasonable suspicion of an independent offense.

### 1. Whether Trooper Boyer Prolonged the Stop Before Learning of Steinman's Criminal History

We begin by narrowing the relevant timeframe to focus on the period between the start of the traffic stop and the point at which Trooper Boyer learned that Steinman had a felony conviction (the point when, as explained below, *see infra* § I.B.2, Trooper Boyer developed reasonable suspicion that Steinman had committed a criminal infraction independent of the traffic violation). We agree with the

Government's position that this is the "relevant timeframe" for purposes of determining whether there was prolongation. We conclude that Trooper Boyer did not unconstitutionally prolong the traffic stop in any way during this period.

As detailed above, during this period, Trooper Boyer pulled over Steinman, asked him a number of questions while checking his documentation, ordered Steinman out of his BMW and into the patrol car, and asked him questions while filling out a traffic citation. Trooper Boyer also requested, waited for, and reviewed a criminal history records check. In our assessment, all of these activities were lawful under the Fourth Amendment because they were either geared towards the mission of the traffic stop (including ensuring officer safety) or did not measurably prolong the stop. In reaching a contrary conclusion, the district court pointed to three specific actions that it said resulted in an unlawful prolongation of the stop: ordering Steinman out of the car, questioning Steinman, and running a criminal history check on Steinman. Because all of these actions were lawful and permissible, the district court erred.

*First*, it did not prolong the stop for Trooper Boyer to ask Steinman to exit the BMW and come with him to the patrol car. It is black-letter law that a trooper may do so in the interest of officer safety. *See Ramirez*, 98 F.4th at 1144; *Mimms*, 434 U.S. at 110. Given the "inordinate risk confronting an officer as he approaches a person seated in an automobile," *Mimms*, 434 U.S. at 110, it was objectively reasonable for Trooper Boyer to order Steinman out of the BMW and into his patrol car during the stop—particularly since Trooper Boyer had observed ammunition as well as Steinman moving around in the vehicle. The district court's ruling to the contrary improperly relied on Trooper Boyer's subjective motivation in wanting to continue the

investigation and question Steinman. But Trooper Boyer's "subjective motivations are irrelevant because 'the Fourth Amendment's concern with "reasonableness" allows certain actions to be taken, *whatever* the subjective intent.'" *Taylor*, 60 F.4th at 1240 (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)). Indeed, our opinion in *Taylor* makes pellucid that even if Trooper Boyer was subjectively motivated by a desire to question Steinman further, that is irrelevant because Trooper Boyer's "subjective motivations, whatever they may have been, could not change the objective reasonableness of [his] actions." *Id.*[3]

*Second*, we also reject the position that Trooper Boyer's questioning of Steinman while he filled out the citation prolonged the traffic stop. We note that many of the initial questions that Trooper Boyer asked, such as those about Steinman's documentation and what was in the vehicle, were clearly related to the mission of the traffic stop and the interest in ensuring officer safety. *See Taylor*, 60 F.4th at 1239 ("Once Taylor was stopped on the side of the street, [the officer] was permitted to ask Taylor basic questions, such as whether Taylor knew why he had been pulled over, whether he had identification, whether he had been arrested before, and whether he had any weapons in the vehicle."). Additionally, much of the questioning focused on Steinman's travel plans, which generally falls within the purview of the traffic-stop mission. *See United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 n.4 (9th Cir. 2001) ("Questions asked initially during a traffic stop must be

---

[3] We observe, parenthetically, that the circumstances of this case illustrate precisely why officers are given the latitude to order drivers out of their vehicles. Recall that law enforcement found a loaded firearm under the driver seat, within Steinman's easy reach.

reasonably related to the justification for the stop. [The officer's] inquiries about Chavez-Valenzuela's starting point, destination and general travel plans were probably justifiable." (citation omitted)), *abrogated on other grounds by Muehler v. Mena*, 544 U.S. 93 (2005); *accord United States v. Cole*, 21 F.4th 421, 429–31 (7th Cir. 2021); *United States v. Braddy*, 11 F.4th 1298, 1311 (11th Cir. 2021).

But even assuming that Steinman is correct that some of Trooper Boyer's questioning during the relevant period fell outside the purview of the traffic-stop mission, Trooper Boyer did not violate Steinman's Fourth Amendment rights. Again, "the Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention." *Rodriguez*, 575 U.S. at 354. The key inquiry is whether the questioning "measurably extend[ed] the duration of the stop." *Johnson*, 555 U.S. at 333.

Here, it did not. Trooper Boyer's body camera footage shows that the arguably investigatory questioning took place while Trooper Boyer was in the process of filling out the citation or while he was waiting for the results of the criminal history check (which was permissible, as discussed below). Because Trooper Boyer asked these questions while he was filling out the citation and waiting for the results of the criminal history check, he did not measurably extend the duration of the traffic stop. *See United States v. Mendez*, 476 F.3d 1077, 1079–80 (9th Cir. 2007) ("[T]he stop was not unnecessarily prolonged. [One officer's] questioning occurred while [another officer] was running a check on Mendez's identification. It could not have expanded the duration of the stop since the stop would, in any event, have lasted until after the check had been completed."); *accord Cole*, 21 F.4th at 429 ("[N]o one disputes that an officer may ask questions unrelated to the stop[] . . . if doing so does not

prolong the traffic stop."). This is not a case where, for example, completing a traffic citation was suspended for the purpose of questioning or questioning occurred after the traffic stop had been effectively completed. *Cf. Landeros*, 913 F.3d at 866–68; *United States v. Gorman*, 859 F.3d 706, 715 (9th Cir. 2017) (concluding that there was prolongation when, after a decision had been made not to issue a citation, the officer inquired about a number of things, including how the driver afforded the vehicle).

To the extent that Steinman argues that simultaneous questioning or discussion inherently slows down the citation-writing process—and thus extends traffic stops—because it is distracting and reduces the capacity of officers to work diligently, we are unpersuaded. Police officers are not automatons required to work with the maximum possible efficiency at all costs. Nor are they required to sit in stony silence like schoolchildren taking an exam during the process of filling out a traffic citation.

In opposing this conclusion, Steinman contends that the district court made a factual finding that the questioning added to the time necessary to complete the citation and that Trooper Boyer "slow played" the citation process.[4] According to Steinman, this factual finding can be reviewed only for clear error, and clear error is not present here.

---

[4] Steinman also points to the opinion of our sister circuit in *United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008), for the proposition that questioning that "blend[s]" permissible inquiries with impermissible ones can be violative of the Fourth Amendment. But besides not being binding, *Peralez* involved an admission that the blending of topics actually prolonged the detention. *See id.* at 1120; *see also id.* at 1121 ("The off-topic questions more than doubled the time Peralez was detained.").

This argument is flawed, and we are unpersuaded. The district court's finding that the citation process took longer than it should was based on erroneous legal conclusions, including about the legality of ordering Steinman out of the car and requesting a criminal history check. Moreover, although the district court did find that Trooper Boyer's questioning resulted in an overall prolongation of the traffic stop, the district court did not focus on the questioning during the period that we are concerned with—namely, between the initial stop and the point when Trooper Boyer reviewed Steinman's criminal history. Quite the contrary: the district court's framing of the issue suggests that it was most concerned about the questioning that occurred *after* the first criminal history check. We are thus unpersuaded that the district court made a factual finding that the questioning *during the period at issue* prolonged the stop.[5]

In sum, because Trooper Boyer's arguably investigatory questioning occurred simultaneously with tasks that fell within the mission of the traffic stop—*viz.*, filling out the citation form and requesting and reviewing a criminal history records check—we cannot say that the questioning

---

[5] Even if the district court had made such a factual finding, under the clear-error standard we could reverse that finding if we have a "definite and firm conviction that a mistake has been committed." *Hylton*, 30 F.4th at 846 (quoting *United States v. Perkins*, 850 F.3d 1109, 1115 (9th Cir. 2017)). Although this standard is deferential, it is not insurmountable, and even if we were to accept Steinman's view of the district court's factual findings—which we do not—we would nevertheless reverse. Our review of the body camera footage and the record shows that any finding that Trooper Boyer's discussion with Steinman during the relevant period extended the duration of the traffic stop would be clearly erroneous.

measurably prolonged the stop. Thus, it does not implicate Steinman's Fourth Amendment rights.

*Third*, Trooper Boyer did not prolong the stop by requesting Steinman's criminal history, waiting for the results, and reviewing the history. Such a precaution falls within the officer-safety aspect of the traffic stop. As we explained in *Hylton*, law enforcement officers may conduct criminal history checks without unconstitutionally prolonging a traffic stop because "a criminal history check is a negligibly burdensome precaution required for officer safety." *Id.* at 846; *id.* at 848 ("[B]ecause a criminal history check 'stems from the mission of the stop itself,' it is a 'negligibly burdensome precaution[]' necessary 'to complete [the stop] safely.'" (alterations in original) (quoting *Rodriguez*, 575 U.S. at 356)). In this way, a criminal records check is different from activities that are more investigative in nature, such as the ex-felon registration check that we discussed in *Evans*, which "in no way advanced officer safety." 786 F.3d at 787.

Under the circumstances of this case,[6] Trooper Boyer's actions in requesting Steinman's criminal history and reviewing it were reasonably justified by a concern for officer safety. After pulling over Steinman, Trooper Boyer

---

[6] The parties disagree as to whether, as some courts have concluded, criminal history checks can in some circumstances be violative of the Fourth Amendment or whether they are always justified as a matter of officer safety. *See United States v. Hunter*, 88 F.4th 221, 226 (3d Cir. 2023) ("[W]e acknowledge that under other circumstances, a criminal record check may be unreasonable if it is more than negligibly burdensome and thus exceeds the stop's mission."). But because we conclude that the criminal records check at issue here was reasonably justified by a concern for officer safety, we need not decide whether criminal records checks are *always* reasonable during traffic stops.

observed possible signs of danger, including the ammunition box in the BMW and Steinman's moving around in the cab of the vehicle. On these facts, a reasonable officer would feel that a criminal-history check was justified. That is true even though Steinman was generally compliant and did not seem to pose an active threat while in the passenger seat of the patrol car.

The district court reached the opposite conclusion by relying on Trooper Boyer's testimony regarding his subjective intent in conducting the criminal history check, including his testimony that he did not routinely conduct such checks during traffic stops and did so here only because of his suspicions of Steinman. But "what matters, under *Hylton*, is that conducting a criminal records check in connection with a traffic stop is objectively reasonable." *Taylor*, 60 F.4th at 1241; *see also Ramirez*, 98 F.4th at 1145–46. Hence, regardless of what Trooper Boyer "might have subjectively believed" or intended as a justification for the criminal history check, the check was permissible if a reasonable officer would have believed it to be justified by officer safety. *Taylor*, 60 F.4th at 1241. That standard is met here.

In sum, all of Trooper Boyer's actions up until the point when he reviewed Steinman's criminal history (approximately seventeen minutes into the stop) were lawful because they fell within the mission of the traffic stop or otherwise did not measurably prolong the stop. Thus, nothing during this period infringed Steinman's Fourth Amendment rights.

### 2. Whether Trooper Boyer Had Reasonable Suspicion of an Independent Offense

Steinman relies heavily on Trooper Boyer's actions *after* the criminal-history check in arguing that Trooper Boyer unreasonably prolonged the stop by taking investigatory measures.  For example, he points to Trooper Boyer's questioning about whether Steinman had ever been in trouble before and whether he still shot guns.  But we need not decide the issue.

Even assuming *arguendo* that Trooper Boyer deviated from the traffic-stop mission to conduct an independent investigation after he finished reviewing the criminal history check, an independent investigation was justified because Trooper Boyer had reasonable suspicion that Steinman was engaged in criminal activity.  Put otherwise, "even if," after the initial criminal history-check, Trooper Boyer "prolonged the encounter beyond the original mission of the traffic stop, [he] had a sufficient basis to do so"—namely, reasonable suspicion of an independent offense.  *See Taylor*, 60 F.4th at 1242; *see also Nault*, 41 F.4th at 1081 (concluding that there was no prolongation of a stop until the point when reasonable suspicion attached and that "continued detention from that point on was supported by independent reasonable suspicion of a DUI").

"Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion.'"  *Evans*, 786 F.3d at 788 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)).  "The reasonable suspicion standard 'is not a particularly high threshold to reach' and is less than probable cause or a preponderance of the

evidence." *Taylor*, 60 F.4th at 1241 (quoting *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc)). But a "mere hunch" is insufficient. *Valdes-Vega*, 738 F.3d at 1078 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).

The district court concluded that, based on the totality of the circumstances, Trooper Boyer would not have had reasonable suspicion that Steinman was committing an independent criminal offense. Reviewing the issue of whether there is reasonable suspicion de novo, *United States v. Guerrero*, 47 F.4th 984, 984 (2022) (per curiam), we disagree and conclude that Trooper Boyer had "reasonable suspicion of an independent offense," namely that Steinman possessed a firearm as a felon in violation of Nevada law. *Taylor*, 60 F.4th at 1242 (quoting *Landeros*, 913 F.3d at 867).

After Trooper Boyer had viewed Steinman's criminal history report, he had (1) observed an ammunition box in Steinman's vehicle; (2) observed a blanket covering a number of items in the back seat; (3) heard Steinman's arguably evasive answer about what was under the blanket; (4) observed furtive movements by Steinman in the BMW; (5) heard Steinman's admission that there was ammunition (though not guns) in the vehicle; and (6) learned that Steinman had felony convictions. Considering the totality of the circumstances, this was sufficient to give Trooper Boyer reasonable suspicion to extend the traffic stop to investigate whether Steinman had firearms in the vehicle in violation of Nevada law. *See Taylor*, 60 F.4th at 1242 (concluding that there was reasonable suspicion for a felon being in possession of a firearm when the officers knew that the motorist was on supervision for being a felon in possession of a firearm and could clearly see an unzipped,

empty fanny pack); *cf. United States v. Baker*, 850 F.2d 1365, 1369 (9th Cir. 1988) ("[H]aving found rounds of .45 caliber ammunition on the defendant's person, and two magazines for an Uzi rifle, the officer had probable cause to believe that firearms were in the vehicle."); *accord United States v. Sample*, 136 F.3d 562, 564 (8th Cir. 1998) ("Considering all of the circumstances—including [the defendant's] initial failure to stop, and particularly the handgun ammunition and ammunition clips in the car, the currency in the vents, and the configuration of the dashboard, we find that there was a fair probability that guns, or other contraband or evidence of a crime, would be found . . . ."); *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) ("The empty ammunition box raises an inference that its contents had been used in a firearm.").[7]

Steinman's arguments to the contrary are unavailing. *First*, Steinman argues that reasonable suspicion could not have attached because of the unreliability of the criminal history search, as demonstrated by the fact that Trooper Boyer later requested confirmation that Steinman had been convicted rather than only charged. Trooper Boyer's later caution does not indicate that the initial results were unreliable—particularly under the lenient reasonable-suspicion standard. *Second*, Steinman insists that the facts articulated above are simply insufficient to establish reasonable suspicion (or probable cause). Steinman is mistaken; reviewing the issue de novo, the totality of the

---

[7] As we explain below, *see infra* § II.B, the totality of the circumstances at this point (or shortly thereafter) sufficed to give Officer Boyer probable cause to search and seize the automobile. It follows that, *a fortiori*, there would also be reasonable suspicion.

circumstances supported *at least* reasonable suspicion to believe that there were firearms in the vehicle.

### 3. Conclusion as to Prolongation of the Traffic Stop

In sum, the district court's decision that there was an unconstitutional prolongation of the traffic stop was erroneous. Trooper Boyer did not prolong the traffic stop in violation of the Fourth Amendment by any of the actions that he took up through the point where he reviewed the criminal-history check, at around 4:08 p.m. And even if there was prolongation after that point, Trooper Boyer had reasonable suspicion that Steinman had committed an independent criminal offense in violation of Nevada law, so he could deviate from the traffic stop to investigate that offense.[8]

---

[8] Additionally, based on his observation of the ammunition box and his knowledge of Steinman's felon status, Trooper Boyer had reasonable suspicion that Steinman had committed a separate independent offense—namely, that he was possessing ammunition in violation of federal law. As discussed in detail below, *see infra* § II.B.1, the parties disagree as to whether a state officer may search or seize an automobile based on probable cause that it contains evidence that a *federal* statute has been violated, which we will refer to as the issue of "cross-enforcement." We conclude that the Government has the better argument and that (as more particularly cabined below) a state law enforcement officer may search or seize an automobile if he has probable cause that it contains evidence that the federal felon-in-possession-of-ammunition statute has been violated.

Because the parties have not argued that the answer to the cross-enforcement issue differs in the context of reasonable suspicion and probable cause and because we agree with the Government on the probable-cause point, *see infra* § II.B.1, we also conclude that Trooper Boyer could have prolonged the traffic stop on the basis that he had reasonable suspicion that a federal offense—namely, a felon being in possession of a firearm—had been committed.

## II. Whether Trooper Boyer Had Probable Cause to Seize the BMW

The district court also suppressed the fruits of the search on the ground that there was no probable cause for Trooper Boyer to seize Steinman's BMW. Reviewing the probable-cause determination de novo, *see Guerrero*, 47 F.4th at 984, we disagree. The information available to Trooper Boyer would have given him probable cause to believe that the BMW contained (1) evidence that Steinman possessed ammunition in violation of federal law and (2) evidence that Steinman possessed firearms in violation of state law. Accordingly, Trooper Boyer could seize the BMW, and suppression was not warranted on this basis.

### A. Legal Standard

The warrantless towing of Steinman's car qualifies as a seizure within the meaning of the Fourth Amendment. *See Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005). "Because warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012).

Here, all parties agree that, in order to seize the BMW, Trooper Boyer must have had probable cause that the BMW contained evidence of a crime. This is derived from the "'automobile exception'" to the Fourth Amendment's warrant requirement, "under which a warrantless search of a vehicle is permitted 'if there is probable cause to believe that the vehicle contains evidence of a crime.'" *United States v. Faagai*, 869 F.3d 1145, 1150 (9th Cir. 2017) (quoting *United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010)); *see also California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The

police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."). This exception applies to warrantless automobile seizures as well as searches. *See United States v. Bagley*, 772 F.2d 482, 491 (9th Cir. 1985).

"'Probable cause exists when, under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place."'" *United States v. Rodgers*, 656 F.3d 1023, 1028 (9th Cir. 2011) (quoting *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006)). "The test for probable cause is not reducible to 'precise definition or quantification.'" *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision." *Id.* at 243–44 (omission and alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)). All that is required is "the kind of 'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act.'" *Id.* at 244 (alteration in original) (quoting *Gates*, 462 U.S. at 238). In determining whether probable cause exists, we "evaluate[] the totality of the circumstances." *United States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012).

## B. Discussion

We conclude that Trooper Boyer was entitled to seize (and search) the BMW because he had probable cause that it contained evidence of unlawful possession of ammunition and unlawful possession of firearms. We examine each in turn.

1. **Probable Cause to Seize Based on Evidence of Possession of Ammunition in Violation of Federal Law**

We first address whether Trooper Boyer could seize the BMW because he had probable cause to believe that it contained evidence of a federal crime—namely, that Steinman possessed ammunition as a felon in violation of 18 U.S.C. § 922(g)(1). Steinman does not truly dispute that the totality of the circumstances would be sufficient to give Trooper Boyer probable cause to believe that the BMW contained evidence of possession of ammunition by a felon. Nor could he. After all, Trooper Boyer saw an ammunition box in plain view in the vehicle, Steinman initially admitted that there was ammunition in the vehicle, and Trooper Boyer knew that Steinman had at least one felony conviction.

Instead, Steinman contends that Trooper Boyer, a state law enforcement officer, "had no basis to seize the car for a potential federal law violation." The parties agree that possession of ammunition is only prohibited by federal law and is not a crime under Nevada law. *Compare* 18 U.S.C. § 922(g)(1) (prohibiting possession or transportation of "any firearm or ammunition"), *with* Nev. Rev. Stat. Ann. § 202.360 (prohibiting ownership or possession of a "firearm"). Analogizing to our opinion in *United States v. $186,416.00 in U.S. Currency* (*U.S. Currency*), 590 F.3d 942 (9th Cir. 2010), Steinman says that the seizure of the BMW cannot be retroactively justified on the grounds that a state law enforcement officer suspected that there was evidence of a federal crime when that same conduct was not unlawful under state law. Steinman also points to district court cases, *United States v. Talley*, 467 F. Supp. 3d 832, 836 (N.D. Cal. 2020), and *United States v. Jones*, 438 F. Supp. 3d 1039, 1053–54 (N.D. Cal. 2020), involving marijuana (which is

legal to possess under the laws of certain states but remains unlawful to possess as a matter of federal law) that generally support his position that a state law enforcement officer cannot have probable cause to seize or search based only on a violation of federal law.

The district court agreed with Steinman, reasoning that "[t]he weight of authority supports the defense's position that . . . state . . . officers cannot justify the search . . . by relying on the proposition that they could have been enforcing an exclusively federal law." The district court thought it was highly relevant that Trooper Boyer, as a Nevada law enforcement officer, is "only tasked with enforcing Nevada law," and that "Nevada law does not authorize Trooper Boyer to enforce federal law to seize property for a punitive violation of federal law."

Whether state officers can rely on suspected violations of federal law in justifying a search or seizure is an issue that our court has never squarely addressed.[9]  And it is a question that has divided the few courts that have addressed it. *See* Orin S. Kerr, *Cross-Enforcement of the Fourth Amendment*, 132 HARV. L. REV. 471, 475 (2018).  Indeed, academics have commented on the "[s]urprisingly" unsettled state of the law in this area.  *Id.*  In simple terms, the question at issue is "whether an officer employed by one government can justify a search or seizure based on a violation of a different government's law."  *Id.* at 474.  This has been called the issue of "cross-enforcement" of the Fourth Amendment.  *Id.*

---

[9] *See United States v. Malik*, 963 F.3d 1014, 1015 n.1 (9th Cir. 2020) (per curiam) (declining to decide this issue); *United States v. Martinez*, 811 F. App'x 396, 398 (9th Cir. 2020) (same); *United States v. Gray*, 772 F. App'x 565, 567 & n.2 (9th Cir. 2019) (same).

After considering the arguments raised by both parties, we agree with the Government that the fact that possession of ammunition by a felon is illegal only under federal law poses no barrier to Trooper Boyer's seizure of the BMW. In reaching this outcome, we consider the following:

*First*, section 922(g)(1), which makes it unlawful for felons to possess ammunition, is a provision of federal law. The Supremacy Clause makes clear that federal law "shall be the supreme Law of the Land." U.S. Const., art. VI, cl. 2. As Judge Learned Hand remarked in a case involving state enforcement of federal prohibition laws, the Supremacy Clause makes federal law "as valid a command within the borders of [a state] as one of its own statutes." *Marsh v. United States*, 29 F.2d 172, 174 (2d Cir. 1928). And, at least where there are no indications to the contrary, we may assume that states are "concerned with the apprehension of offenders against laws of the United States, valid within [their] borders, though they cannot be prosecuted in [their] own courts." *Id.*; *see also* Kerr, *supra*, at 503–06, 530 (discussing Judge Learned Hand's opinion in *Marsh* and its relevance to the cross-enforcement issue). Applying this reasoning here, we can presume that the State of Nevada has an interest in ensuring that federal felon-in-possession-of-ammunition laws are enforced even if Nevada has chosen not to criminalize that same conduct.

Relatedly, "[s]ince the time of the Founding, Congress has looked to state and local law enforcement to help enforce federal criminal laws"—particularly given the fact that there are few roving federal law enforcement officers. Kerr, *supra*, at 530. Accepting Steinman's approach would almost certainly lead to the under-enforcement of federal criminal statutes, and we cannot adopt an approach that fails to acknowledge the reality that, from the Founding onward,

many federal prosecutions arise out of encounters with state law enforcement officers.  *See id.*

*Second*, it is important to recognize that although the Fourth Amendment has been incorporated against the states, it remains a quintessentially federal standard whose protections do not vary from jurisdiction to jurisdiction.  *See Virginia v. Moore*, 553 U.S. 164, 172 (2008) ("'[W]hether or not a search is reasonable within the meaning of the Fourth Amendment' . . . has never 'depend[ed] on the law of the particular State in which the search occurs.'" (first and third alterations in original) (quoting *California v. Greenwood*, 486 U.S. 35, 43 (1988))).  Thus, "state law [does] not alter the content of the Fourth Amendment."  *Id.* For example, even if state law makes clear that a misdemeanor is not an arrestable offense, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  Although this principle is not determinative of the cross-enforcement question before us, it does cast some light on the best path forward.  *Moore*, *Atwater*, and similar cases suggest that the fact that certain conduct is not criminalized under state law is ultimately irrelevant to whether a state law enforcement officer violates the Fourth Amendment by searching and seizing based on evidence of a federal crime. Such an approach makes sense: if conduct (such as seizing a car based on probable cause that it contains evidence of a violation of federal law) is not violative of the Fourth Amendment in one state, it is not violative of the Fourth Amendment in another state.

*Third*, we have previously observed that "[t]he general rule is that local police are not precluded from enforcing

federal statutes." *Gonzales v. City of Peoria*, 722 F.2d 468, 474 (9th Cir. 1983), *overruled on other grounds by Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc). We see no reason to deviate from this general rule here.

In particular, we disagree with Steinman's attempts to analogize this case to situations in which state law enforcement officers are affirmatively prohibited by state law from arresting, searching, or seizing based on evidence of a federal offense—a circumstance common in cases relating to the presence of marijuana. Courts that have concluded that state law enforcement officers cannot search or seize based on the suspected presence of marijuana where marijuana is legal under state law have relied upon this factor. *See Talley*, 467 F. Supp. 3d at 837 (concluding that "federal law cannot provide an alternate basis for probable cause" in the context of marijuana that was legal under state law because of a state statute providing that "'no conduct deemed lawful by this section shall constitute the basis for detention, search, or arrest'" (quoting Cal. Health & Safety Code § 11362.1(c))); *Commonwealth v. Craan*, 13 N.E.3d 569, 577–78 (Mass. 2014) (discussing the impact of decriminalization of marijuana on the authority of state law enforcement officers to search or seize). *See generally* Kerr, *supra*, at 479–82, 484–86 (discussing how some courts allow cross-enforcement if it is authorized by state law or, at a minimum, if it is not prohibited by state law).

Assuming *arguendo* that it is relevant whether state law prohibits state law enforcement officers from searching or

seizing based on evidence of a federal crime,[10] we still see this case as distinct from the marijuana cases because, here, there is no provision of Nevada law prohibiting state law enforcement officers from enforcing the federal ban on felons possessing ammunition. Quite the contrary: Nevada law appears to affirmatively authorize Trooper Boyer's conduct. After all, it authorizes law enforcement officers to investigate "crimes" generally and not state crimes specifically. *See* Nev. Rev. Stat. § 171.123.1 (West 2023) ("Any peace officer may detain any person whom the officer encounters under circumstances which would reasonably indicate that the person has committed . . . *a crime* or civil

---

[10] The Government suggests that *Talley* and the other cases holding that state law enforcement officers cannot have probable cause to search or seize based on evidence of marijuana possession are wrongly decided because those decisions fail to grapple with the rule from *Moore* and *Atwater* that whether officers have state statutory authority to investigate a crime is irrelevant to the Fourth Amendment inquiry. Some academics seem to agree, *see* Kerr, *supra*, at 481–82, 518–19 (suggesting that authority that relies on state authorization for cross-enforcement is inconsistent with modern Supreme Court jurisprudence), and other courts have rejected the approach taken in *Talley*, *see, e.g.*, *United States v. Sanders*, 248 F. Supp. 3d 339, 347 (D.R.I. 2017).

However, we need not decide whether it is relevant that state law prohibits arrest, search, or seizure based on the federally illegal conduct because (unlike in the marijuana cases) Steinman has not shown that any Nevada law restricts the authority of state law enforcement officers to search or seize based on the presence of ammunition. Accordingly, there is no need at this juncture to directly opine on the viability of *Talley* and similar cases because even assuming that those cases were correctly decided, they do not help Steinman. Moreover, although our concurring colleague contends that our decision today could permit cross-enforcement even when "a state does not want its officers assisting in the enforcement of federal law[,]" Concurrence at 49, the effect of a state statute prohibiting or limiting cross-enforcement remains a question for another day and not one that we must decide here.

infraction." (emphasis added)). We thus see this case as different from *Talley* and the other marijuana-based cases on which Steinman relies.

*Fourth*, we find support in the decisions of our sister circuits that have concluded that evidence of federal crimes may be seized by state officers if that evidence is in plain view. In *United States v. Smith*, 899 F.2d 116, 118 (1st Cir. 1990), the First Circuit (per then-Judge Breyer) rejected an argument by the defendant that evidence of a federal crime (namely, a firearm) could not be seized because "state police lacked 'authority' to seize the weapon." The *Smith* court observed that it was "not aware of any state or federal law that *prohibits* state police from seizing a weapon, in plain view, that they reasonably believe constitutes evidence of a federal crime." *Id.* Thus, there was no unreasonable seizure as would be prohibited by the Fourth Amendment. *Id.* The Tenth Circuit agreed with the approach in *Smith* and concluded that state law enforcement officers could seize evidence of federal crimes if that evidence was in plain view. *See United States v. Le*, 173 F.3d 1258, 1271 (10th Cir. 1999). Although the question before us is somewhat distinct, we find both *Smith* and *Le* instructive. As in those cases, we are aware of no binding authority stating that state law enforcement officers cannot search or seize an automobile based on evidence that it contains a federal crime.

*Finally*, it bears remembering that suppression of evidence is an extraordinary remedy that carries a substantial cost to society. *See Davis v. United States*, 564 U.S. 229, 237 (2011). Thus, although the "bitter pill" of suppression must be swallowed when necessary to deter Fourth Amendment violations, it remains a "'last resort.'" *Id.* (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

Particularly given the dearth of authority on the issue, we are not convinced that it is appropriate to administer the harsh medicine of suppression here simply because the BMW was seized because it contained evidence of a violation of *federal* law rather than *state* law.

We thus conclude that Trooper Boyer could seize Steinman's BMW pursuant to the automobile exception to the Fourth Amendment's warrant requirement because he had probable cause to believe that it contained evidence of a federal crime—namely, being a felon in possession of ammunition.

In arguing against this outcome, Steinman relies heavily on our opinion in *U.S. Currency*, 590 F.3d 942. But *U.S. Currency* casts minimal light on the question before us. In that case, the Los Angeles Police Department (LAPD) applied for a search warrant to search a facility based on suspected violations of state marijuana laws. *Id.* at 946–47. The LAPD seized currency pursuant to the warrant, and the federal government subsequently sought forfeiture of that currency. *Id.* at 947. However, it was later determined that the warrant was not supported by probable cause as to the violation of state law. *Id.* We concluded that the currency must be suppressed, reasoning that although there may have been probable cause to seek a warrant based on a violation of federal law, "that was not what the LAPD was doing" because "[n]othing in the documents prepared at the time the warrant was obtained from the state court or in the procedure followed to obtain that warrant supports the proposition that the LAPD thought it was pursuing a violation of federal law." *Id.* at 948.

We read *U.S. Currency* as standing only for the proposition that an invalid warrant that was sought for a

violation of state law could not be saved because, counterfactually, officers perhaps could have sought the warrant based on a violation of federal law. Whether one of the exceptions to the warrant requirement could justify the seizure was simply not at issue in *U.S. Currency*. That case accordingly casts little light on the question before us today—whether, in the context of a warrantless seizure, probable cause can be based on a suspected violation of federal law. Indeed, *U.S. Currency* arguably cuts against Steinman because we found it notable in *U.S. Currency* that the LAPD had never sought a federal search warrant or "indicated that it was pursuing a violation of federal law"—which implies that the LAPD *could* have taken these actions but did not in that case. *See id.* at 948.

Our view is not changed by the fact that, in this case, Trooper Boyer did eventually seek a search warrant that was based entirely on state law violations. Trooper Boyer did so *after* seizing the car, and the key question here is whether his seizure could be justified by one of the exceptions to the warrant requirement. *U.S. Currency* is thus of no help in resolving this issue.[11]

We are also unpersuaded by the district court's reliance on *Ker v. California*, 374 U.S. 23 (1963). To be sure, the

---

[11] Nor does it matter that the BMW was later searched pursuant to the state-law-focused warrant. As will be discussed below, *see infra* § III, the warrant is invalid and so we must consider whether the search could be justified under the automobile exception to the warrant requirement because it contained evidence of a federal crime. That is different from the inquiry at issue in *U.S. Currency*, which was concerned only with whether, counterfactually, a seizure conducted pursuant to an invalid state warrant could be saved if probable cause existed under federal law. *Cf.* 590 F.3d at 948. Simply put, *U.S. Currency* cannot sustain the heavy weight that Steinman puts upon it.

*Ker* court stated that "the lawfulness of arrests for federal offenses is to be determined by reference to state law insofar as it is not violative of the Federal Constitution." *Id.* at 37. But the Supreme Court has moved away from this rule, *see Moore*, 553 U.S. at 172–73, and we find it to be of limited use in resolving the cross-enforcement issue. *See* Kerr, *supra*, at 481–82, 514–19 (discussing the irrelevance of *Ker* and related cases to the cross-enforcement issue). Moreover, even assuming that the rule from *Ker* is applicable, this is not a situation where state law prohibits Trooper Boyer's conduct; to the contrary, state law arguably authorizes Trooper Boyer's conduct here. *See* Nev. Rev. Stat. § 171.123.1.

Our concurring colleague objects to deciding this question at all, arguing that we should not reach it because "[a]s a general rule, we should not decide a constitutional question unless it is necessary to do so." Concurrence at 47. This argument seemingly rests on the principle that courts should not "decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring) (quoting *Burton v. United States*, 196 U.S. 283, 295 (1905)). Our concurring colleague is certainly correct that we have an "obligation to avoid deciding constitutional questions needlessly" when there are other options to resolve a case. *See Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004). But there is no way to avoid deciding constitutional issues here; even if we were to take the approach favored by the concurrence and analyze only whether Trooper Boyer had probable cause to seize Steinman's BMW based on a violation of Nevada state law, that would still present a constitutional question. In other words, regardless of which path we take in resolving the

seizure inquiry, we must decide a constitutional question. In such circumstances, we are unconvinced that it is more prudent to avoid a recurring constitutional issue that would squarely resolve this case.

Accordingly, we conclude that, under the circumstances of this case, Trooper Boyer could seize Steinman's BMW because he had probable cause to believe that it contained evidence of a federal crime (namely, possession of ammunition by a felon), even though that same conduct was not criminalized under Nevada law.

### 2. Probable Cause to Seize Based on Evidence of Possession of Firearms in Violation of State Law

For the reasons given above, Steinman is incorrect that Trooper Boyer's seizure of the BMW could not be based on probable cause that it contained evidence of a federal crime. But even if we were to agree with Steinman on this point (which we do not), the seizure of the BMW was nevertheless constitutional because there was probable cause to believe that that Steinman had violated Nevada law by possessing firearms as a felon. *See* Nev. Rev. Stat. Ann. § 202.360 (West 2022) (prohibiting the possession of firearms by felons). Specifically, the totality of the circumstances, including the circumstantial evidence of firearm ownership, gave Trooper Boyer probable cause to believe that the BMW contained firearms, which is evidence of a violation of Nev. Rev. Stat. Ann. § 202.360. Thus, Trooper Boyer could seize the automobile.

We reach this conclusion without much difficulty. As noted above regarding the issue of reasonable suspicion, by the time the BMW was seized, Trooper Boyer had (1) observed an ammunition box in the vehicle; (2) observed

a blanket covering a number of items in the back seat; (3) heard Steinman's arguably evasive answer about what was under the blanket; (4) observed Steinman moving around in the BMW as he approached; (5) heard Steinman's admission that there was ammunition (though not guns) in the vehicle; and (6) learned that Steinman had felony convictions. Additionally, going into the probable-cause calculus is the fact that Trooper Boyer learned that Steinman had been untruthful about his felony convictions. This was sufficient to give Trooper Boyer probable cause to seize the vehicle on the grounds that it could contain a firearm. Trooper Boyer was, of course, permitted to disbelieve Steinman's assertion that there were no firearms in the vehicle. *See United States v. Malik*, 963 F.3d 1014, 1016 (9th Cir. 2020) (per curiam).

We find it particularly salient that the BMW contained an ammunition box in plain view. Indeed, we have found the presence of ammunition (or other indicia of firearm ownership) on a defendant's person to be highly important in the probable-cause analysis. *See Baker*, 850 F.2d at 1369 ("[H]aving found rounds of .45 caliber ammunition on the defendant's person, and two magazines for an Uzi rifle, the officer had probable cause to believe that firearms were in the vehicle."); *accord United States v. Childers*, 73 F.4th 960, 965 (8th Cir. 2023) ("Upon lawful discovery and seizure of the bullets from Childers's person, the officers had probable cause to believe that Childers had committed a felony involving a firearm."). Steinman attempts to distinguish *Baker* on the basis that it involved ammunition being found on a defendant's person rather than in an automobile, but we do not see how that distinction is of any moment. There is also persuasive—though not binding— authority suggesting that the presence of bullets in an

automobile can give rise to probable cause that the automobile contains firearms. *See United States v. Young*, 213 F.3d 645, 2000 WL 278430, at *1 (9th Cir. Mar. 14, 2000) (unpublished table disposition) (considering bullets found loose in the trunk of a car); *United States v. Horn*, 234 F. App'x 466, 467 (9th Cir. 2007) (considering the existence of a bag the officer believed to contain bullets); *accord Sample*, 136 F.3d at 564 (discussing bullets found in the passenger compartment of an automobile); *Cooper*, 19 F.3d at 1163 (discussing an empty ammunition box). As a panel of our court cogently articulated, "[b]ullets strongly suggest the presence of a gun." *Young*, 213 F.3d 645, 2000 WL 278430, at *1. Although that statement was made in an unpublished—and thus nonprecedential—case, we firmly agree with that common-sense sentiment.

Moreover, the ammunition box does not stand alone. Trooper Boyer also saw arguably furtive movements as he approached the BMW and shortly thereafter found a blanket in the back seat that appeared to cover a number of items. *See United States v. Spencer*, 1 F.3d 742, 746 (9th Cir. 1992) (discussing "concealing movements in the automobile's front seat"); *Rodgers*, 656 F.3d at 1029 (discussing the relevance of furtive movements). And Steinman's response to Trooper Boyer's inquiry about the blanket—that it was just "his stuff" was evasive. Furthermore, Trooper Boyer was aware that Steinman was not telling the complete truth about his felon status. Taken together, the totality of the circumstances was sufficient to establish probable cause that the vehicle contained firearms.

In arguing against this conclusion, Steinman relies heavily on *United States v. Nora*, 765 F.3d 1049, 1058–59 (9th Cir. 2014). But *Nora* is inapposite. There, we addressed whether an officer's observation that the

defendant was holding a handgun when he went into his house gave officers probable cause to search the house for *other* firearms and ammunition. *See id.* at 1058. We concluded that it did not because, although there was probable cause to look for the specific handgun that the officers had seen the defendant with, "the officers' firsthand observation of [the defendant] with a gun in his hand did not give them reasonable grounds to believe that any additional firearms would be found in the house." *Id.* at 1059. But the inference at issue in this case—that because a person has bullets, he may have a firearm—is far less of a logical leap than the inference in *Nora* that because a person has a firearm, he may have *more* firearms. And, again, this case involves indicia that contraband was hidden in the car—such as Steinman's movements within the BMW, the blanket covering the items, and Steinman's lies about his felony past—that were utterly absent in *Nora*.

Thus, the district court erred in concluding that there was not probable cause to seize (and search) the BMW on the ground that it contained evidence that Steinman was violating Nevada's proscription on felons possessing firearms. It follows that Trooper Boyer did not violate Steinman's Fourth Amendment rights in seizing his BMW, so that is not a basis for suppressing the guns and ammunition.

### 3.  Conclusion as to Probable Cause

In sum, the district court erred in concluding that there was not probable cause to seize (and search) the BMW on the ground that it contained evidence that (1) Steinman was violating federal law by possessing ammunition and (2) Steinman was violating Nevada law by possessing

firearms.  Thus, Trooper Boyer did not violate Steinman's Fourth Amendment rights in seizing his BMW

## III. Whether Warrant Overbreadth Provides a Basis to Affirm the District Court's Suppression Order

Finally, Steinman also argues that even if the district court did err in concluding that the stop was unconstitutionally prolonged and the seizure was not justified by probable cause, we should still affirm the district court's suppression order because of warrant overbreadth. According to Steinman, the district court reasoned that warrant overbreadth was an independent ground for suppression, and the Government has failed to challenge this ruling on appeal.

Steinman is partly right and partly wrong.  We agree with Steinman that the Government has waived any challenge to overbreadth and that the district court saw warrant overbreadth as an independent basis for exclusion.[12]  Thus, for purposes of this appeal, we accept the proposition that the search warrant was overbroad and thus could not justify a search of Steinman's automobile.  But we disagree with Steinman that this overbreadth requires suppression of the evidence found in the automobile.

Instead, we agree with the Government that the overbreadth of the warrant is ultimately immaterial because a warrantless search of the BMW was permissible under the automobile exception to the Fourth Amendment's warrant

---

[12] The Government asserts in passing that the district court never made a formal ruling on warrant overbreadth.  This is a surprising and unpersuasive contention in light of the clarity of the district court's oral ruling and articulation of the bases for suppression.

requirement.[13]   In *Coolidge v. New Hampshire*, 403 U.S. 443, 453 (1971), the Supreme Court clarified that evidence seized pursuant to a defective warrant could possibly still be admitted if the search and seizure that found the evidence was lawful under "some other theory,"  including exceptions to the warrant requirement.  And even if *Coolidge* did not settle this issue, courts across the nation have declined to suppress the fruits of searches that were conducted pursuant to a defective warrant if an exception to the warrant requirement would otherwise have justified the search.  *See United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996) ("Because probable cause existed for the search and the [arguably invalid] warrant was unnecessary, the search was valid."); *United States v. McCoy*, 977 F.2d 706, 710 (1st Cir. 1992) ("Assuming, without deciding, the search warrant was invalid, we nonetheless conclude that . . . the search was permissible under the 'automobile exception' to the Fourth Amendment warrant requirement."); *United States v. Poole*, 718 F.2d 671, 675 (4th Cir. 1983) ("Since no warrant was required, any defects in the warrant that was obtained cannot serve as a basis on which to suppress . . . ."); *United States v. Clark*, 559 F.2d 420, 426 (5th Cir. 1977) ("It is well established that evidence gained by a search conducted under authority of a defective search warrant may still be admissible if an exception to the warrant requirement is present."); *see also Commonwealth v. Campbell*, 807 S.E.2d 735, 738–39 (Va. 2017) ("We conclude, as have a number of other courts, that the procurement of a defective warrant

---

[13] To the extent that Steinman suggests that he has not had a fair opportunity to litigate this issue because it is largely discussed in the Government's reply brief, we are unpersuaded—particularly given the fact that we granted Steinman's request to file supplemental briefing on this issue.

does not require suppression if the search is nonetheless justified on an alternate ground."). *See generally* 2 Wayne R. LaFave SEARCH & SEIZURE § 4.1(b) (6th ed.), Westlaw (database updated Mar. 2024). We join these courts and hold that the fruits of a search conducted pursuant to an overbroad or otherwise unlawful warrant need not be suppressed if the search could have been conducted pursuant to an exception to the Fourth Amendment's warrant requirement.

In response, Steinman asserts that law enforcement has a choice—either to get a warrant or to search pursuant to an exception to the warrant requirement—and that because the Government opted to get a warrant here, it cannot rely on any of the exceptions to the warrant requirement to support admissibility of the evidence. But Steinman offers no support for this contention, and we would find his position unpersuasive even leaving aside the consensus of authority on this point. Steinman's proposed approach would actually *disincentivize* law enforcement from seeking warrants in cases like these. Such an outcome is clearly to be avoided; law enforcement should not be penalized for caution and concern for procedure. In the words of another court that came to the same conclusion as we do, "[p]olice officers should not be punished for trying to comply with Fourth Amendment requirements in those situations where, as here, they could have conducted a warrantless search in the first instance." *State v. Tomah*, 586 A.2d 1267, 1269 (Me. 1991).

Moreover, as noted above, modern exclusionary-rule jurisprudence recognizes the substantial costs of the exclusionary rule and that exclusion of probative evidence is a "last resort." *Davis*, 564 U.S. at 237 (quoting *Hudson*, 547 U.S. at 591). We are disinclined to apply such a costly remedy when the evidence sought to be excluded would be

admissible under a valid exception to the warrant
requirement.

Thus, notwithstanding the overbreadth of the warrant,
the fruits of the search of Steinman's BMW—namely, the
guns and ammunition—need not be suppressed if the search
could have been justified pursuant to one of the exceptions
to the warrant requirement. Such a justification is present in
this case. As indicated above, Trooper Boyer had probable
cause to search and seize the BMW without a warrant
pursuant to the automobile exception to the Fourth
Amendment's warrant requirement because he had probable
cause to believe that it contained evidence of violations of
both federal and state law. *See Acevedo*, 500 U.S. at 569–
70; *Faagai*, 869 F.3d at 1150. And the automobile exception
may apply even if the automobile has been towed back to the
police station or elsewhere. *See Acevedo*, 500 U.S. at 570;
*Chambers v. Maroney*, 399 U.S. 42, 51–52 (1970); *Scott*,
705 F.3d at 417. Thus, the fruits of the search need not be
suppressed.

## CONCLUSION

We are compelled to reverse the district court's
suppression order because it committed multiple errors.
*First*, the district court erred in concluding that Trooper
Boyer violated Steinman's constitutional rights by
unlawfully prolonging the traffic stop. We conclude that
Trooper Boyer had reasonable suspicion of an independent
offense after he learned of Steinman's felony conviction and
that he did not measurably prolong the traffic stop up to that
point. *Second*, the district court erred in concluding that
Trooper Boyer lacked probable cause to seize Steinman's
automobile. To the contrary, Trooper Boyer had probable
cause to believe that the automobile contained evidence of

two independent offenses—namely, possession of ammunition in violation of federal law and possession of firearms in violation of Nevada law. *Third*, the district court erred in concluding that warrant overbreadth requires suppression. Even though we do not disturb the district court's ruling that the search warrant is unconstitutionally overbroad, it was nonetheless error for the district court to exclude the fruits of the search because the search of Steinman's vehicle would have been permissible under the automobile exception to the Fourth Amendment's warrant requirement. Thus, the district court should not have suppressed the guns and ammunition seized from Steinman's vehicle.

**REVERSED.**

---

Wu, District Judge, concurring:

Because we need not—and should not—break new ground today by addressing the undeveloped and potentially sweeping "cross enforcement" issue, I concur with the majority opinion except for Part II.B.1.

As a general rule, we should not decide a constitutional question unless it is necessary to do so. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–47 (1936) (Brandeis, J., concurring) ("'It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.'" (quoting *Burton v. United States*, 196 U.S. 283, 295 (1905))); *Christopher v. Harbury*, 536 U.S. 403, 417 (2002) (highlighting "the obligation of the Judicial Branch to avoid deciding constitutional issues needlessly"). Several panels of this Court have previously declined to address "cross-

enforcement" arguments when it was unnecessary to the disposition of the appeal. *See, e.g.*, *United States v. Malik*, 963 F.3d 1014, 1015 n.1 (9th Cir. 2020) (declining to reach the question of whether a Nevada state officer had probable cause to search based upon federal marijuana laws because the officer had probable cause to search based upon violations of Nevada state law); *United States v. Gray*, 772 F. App'x. 565, 567 n.2 (9th Cir. 2019). So, too, should we. Because we conclude "without much difficulty" that Trooper Boyer had probable cause to seize Steinman's BMW based upon a violation of Nevada state law, there is no reason for the majority to consider the question of whether the federal law violation provides another potential basis for probable cause.

Additionally, I cannot join Part II.B.1 because it rests on doubtful assumptions and thrusts Fourth Amendment jurisprudence into a precarious position with no clear limiting principles. This is especially true in the contexts of immigration and marijuana laws, where federal and state priorities often diverge.

Firstly, I find unconvincing the majority's conclusion that Nevada has an interest in ensuring the federal felon-in-possession-of-ammunition statute is enforced. Unlike the federal government, Nevada could have—but has chosen not to—criminalize a felon's possession of ammunition. *Compare* 18 U.S.C. § 922(g)(1), *with* Nev. Rev. Stat. § 202.360. The majority opinion initially references the Supremacy Clause. But the Supremacy Clause—which "invalidates state laws that 'interfere with, or are contrary to,' federal law," *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 22 (1824) (Marshall, C.J.))—is not directly implicated here. Furthermore, it is implicit in

the concept of federalism that federal and state governments may have different, if not fully divergent, policy and political priorities. *See Printz v. United States*, 521 U.S. 898, 918–19 (1997) ("Although the States surrendered many of their powers to the new Federal Government, they retained 'a residuary and inviolable sovereignty.'" (citing The Federalist No. 39, at 245 (J. Madison))). That Nevada has not promulgated its disapproval of the federal felon-in-possession-of-ammunition statute does not establish a converse interest in enforcing it, as the majority assumes.

Secondly, despite the majority's apparent attempt to cabin its ruling to the present case, there is simply nothing preventing today's new rule from being applied in other cases where the "cross-enforcement" issue is more fraught and more common. As this issue arises with some frequency in the context of immigration and marijuana laws, what if a state does not want its officers assisting in the enforcement of federal law? The majority opinion offers no explanation on how today's rule would not naturally extend to cases where a state has gone so far as to codify its opposition to "cross-enforcement" by its police officers as to a particular federal law. Indeed, the majority opinion assumes only for the sake of argument that state law is even relevant to the "cross-enforcement" issue. And in *Martinez-Medina v. Holder*, a previous panel of this Court decided in dicta that a state law enforcement officer's violation of an Oregon law that *explicitly* forbid state officers from enforcing federal immigration laws did not warrant a finding of a Fourth Amendment violation. 673 F.3d 1029, 1037 (9th Cir. 2011) (citing *Virginia v. Moore*, 553 U.S. 164, 173–74 (2008)). Despite its reliance on Orin S. Kerr, *Cross-Enforcement of the Fourth Amendment*, 132 HARV. L. REV. 471 (2018), the majority opinion makes no mention of Kerr's proposed

limitations on "cross-enforcement"—nor does it demarcate a rule of its own.[1]

The inescapable conundrum with the majority's unrestricted endorsement of "cross-enforcement" is that Trooper Boyer—a Nevada *state* law enforcement officer entrusted to enforce the laws of Nevada—is determined today to have committed no Fourth Amendment violation for seizing Steinman's automobile based on conduct that is entirely legal under Nevada law. In other words, the majority's new rule opens the door, as one district court has prudently observed, "to the paradoxical result of allowing state law enforcement officers to defy the state laws they are entrusted with upholding so that they might enforce federal laws which they cannot be compelled to enforce." *United States v. Talley*, 467 F.Supp. 3d 832, 837 (N.D. Cal. 2020) (citing *Printz*, 521 U.S. at 918–19).

In the end, the government's "cross-enforcement" argument is but one of several contentions set forth in this appeal—the full ramifications of which have not been fully developed in the record before us. Because we find "without much difficulty" that Trooper Boyer was justified in seizing Steinman's automobile based upon a violation of state law, it is unnecessary to reach the "cross-enforcement" issue today. The majority's decision to nevertheless break new ground does more than start a conversation on a novel

---

[1] For example, Kerr proposes this rule: "Officers can rely on a government's criminal law to justify a search or seizure only when that government has authorized the officer to search or seize. Authorization of the enacting government, not the officer's home government, should control." Kerr, *supra*, at 477. I would not necessarily endorse this approach, but I note Kerr's proposal here simply to say that the article upon which the majority opinion relies suggests some limitations to "cross-enforcement" that the majority does not mention.

constitutional law doctrine—it sweeps with it a whole host of critical Fourth Amendment issues without announcing a rule or limiting principle to be used in future cases.  For these reasons, I respectfully concur in the majority opinion expect for Part II.B.1.